UNITED STATES of America
v.
CONTINENTAL CAN COMPANY, Inc.
and
Local #12146 of the International Union
of District 50, U. M. W. A.

Civ. A. No. 6098–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Nov. 3, 1970.

Dennis Gordon, Stuart Pierson, Civil Rights Section, Dept. of Justice, Washington, D. C., for plaintiff.

Willis S. Ryza, Michael A. Warner, Pope, Ballard, Kennedy, Shepard & Fowle, Chicago, Ill., for Continental Can Co., Inc.

Beecher E. Stallard, Jay J. Levit, Richmond, Va., for Local #12144, etc.– Internat'l. Union.

## FINDINGS OF FACT

MERHIGE, District Judge.

This action is brought by the Attorney General on behalf of the United States, seeking relief for alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, et seq.

The defendant, Continental Can Company, Inc. (hereinafter "The Company"), is incorporated under the laws of the State of New York, and is doing business in the State of Virginia and the City of Hopewell, where it is engaged in the manufacture of paperboard and kraft paper products for interstate shipment. The Hopewell plant is one of approximately 155 plants operated by the Company throughout the United States.

The Company employs approximately 800 people at its Hopewell plant, of whom almost 200 are Negroes. Of these, there are approximately 516 white and 192 Negro hourly-rated employees.

Defendant, Local #12146 of the International Union of District 50, U.M.W.A. (hereinafter "the Union"), is an unincorporated association doing business in the State of Virginia and the City of Hopewell. The Union is the only bargaining agent authorized to represent hourly-rated employees at the Company's Hopewell plant, and except for approximately 20 employees, the Union represents all the hourly-rated employees. In this capacity, the Union has entered into collective bargaining agreements from 1948 through the present time.

The operations of the Company's plant are organized on a departmental basis. The jobs within each department generally require skills and abilities which differ from one department to another and each department has a designated function in the overall operation of the plant.

*Wood Receiving and Preparation* (Approximately 50 employees) - Receiving and handling of pulpwood logs and wood chips and the converting of pulpwood into wood chips.

*Pulp Mill* (Approximately 100 employees) - The conversion of wood chips to wood pulp, including the processing of wood chips through cooking and screening, and the operation of equipment for the recovery and conversion of spent chemicals for reuse in the pulping process.

*Paper Mill* (Approximately 100 employees) - The operation of two Fourdrinier paper machines for the production of finished paper from wood pulp stock.

*Board Mill* (Approximately 45 employees) - The operation of a cylinder paper machine for the production of paperboard from wood pulp stock.

*Converting* (Approximately 10 employees) - The operation of machinery for slitting and rewinding paper and paperboard rolls to meet customer specifications as to width and diameter, and the operation of machinery for laminating paperboard sheets from paper rolls.

*Shipping and Finishing* (Approximately 50 employees) - The preparation, processing, and loading of finished paper, and paperboard rolls and sheets for shipment to customers.

*Process Control* (Approximately 35 employees) -. The performance of tests at various stages of the pulp, paper and paperboard production processes for the purpose of controlling specifications and quality.

*Power* (Approximately 35 employees) - The operation and maintenance of turbines, boilers and auxiliary equipment for the generation of electrical and steam energy throughout the mill.

*Mechanical* (Approximately 85 employees) - The performance of various mechanical, machinist, metal fabrication and welding functions with respect to the installation, maintenance, and repair of machinery and equipment throughout the mill.

*Carpenter* (Approximately 12 employees) - The performance of carpentry work with respect to maintenance and construction of buildings and equipment throughout the mill.

*Electrical* (Approximately 40 employees) - The performance of electrical installation, maintenance and repairs throughout the mill.

*Pipefitting* (Approximately 40 employees) - The performance of pipefitting, plumbing, and pipe welding with respect to the installation, maintenance, and repair of piping throughout the mill.

*Painting and Insulating* (Approximately 22 employees) - The performance of painting of buildings and equipment throughout the mill, and the covering of piping and other equipment with insulating material.

*Lubrication* (Approximately 15 employees) - The lubrication and oiling of machinery and equipment throughout the mill.

*Meter* (Approximately 10 employees)- The installation, maintenance, and repair of air conditioning equipment and a variety of measuring and recording instruments used throughout the mill.

*Salvage* (Approximately 6 employees) - The salvaging of used material for reuse throughout the mill.

*Store Room* (Approximately 8 employees) - The receiving, storing, and disbursing of materials and supplies for use throughout the mill.

*General Yard* (Approximately 30 employees) - The performance of a variety of janitorial, grounds maintenance, material handling, and construction tasks throughout the mill.

For purposes of promotion, demotion, and training of hourly employees, each of the departments at the Hopewell plant is organized into one or more lines of progression. Entrance into each department generally is effected at the lowest-paying job (entry-level job) of the line(s) of departmental progression, and vacancies generally are filled by promotions to jobs within the lines.[1]

The organization of the departments into lines of progression and the system for advancement described above was adopted in order to provide a systematic method for on-the-job training. The jobs have been placed within the lines of progression so that, in most instances, each job is functionally related to the successive higher-rated jobs. In this way, an employee in performing his current job gains training and experience which enables him to qualify to perform the duties and responsibilities of the higher-rated jobs in the progression line.

Pursuant to the Labor Agreement currently in effect between the Union and the Company, and to similar past agreements, the Company periodically prepares "Seniority Lists," which list all the hourly employees then employed at the Hopewell plant, and which, among other things, show for each such employee:

1) His payroll number;

2) His permanent job assignment;

3) His temporary job assignment, if any (designated by V S & T);

4) The most recent date of his employment with the Company (i.e., his "plant seniority");

5) The date of his assignment to his then present job (i.e., his "job seniority"); and

1. The current departments and the lines of progression, as well as the jobs which fall in each line, and the current rate of pay for each job may be found in the current collective bargaining agreement.

6) Whether or not he has waived a change of job classification.

The pertinent Labor Agreements also require that seniority lists prepared by the Company list each employee's departmental seniority date, but none of the lists offered in evidence contain such information.

The provisions of the defendants' current collective bargaining agreement which deal with promotions, training, demotions, and transfer have been substantially unchanged at all times material to this action. In selecting employees for promotion, the Company considers the ability, diligence, and departmental seniority of the competing employees. Whenever the ability and diligence of the competing employees are relatively equal, departmental seniority is determinative.[2]

Under provisions of the current collective bargaining agreement, which have remained substantially unchanged at all times material to this action, employees may be transferred "involuntarily" from one department to another at the Company's instance. Employees may also seek transfers from one department to another. Employees who transfer through either of these devices, however, receive no seniority credit for purposes of promotion, demotion, and training in the departments to which they transfer for the time they have worked for the company prior to such transfer. In other words, employees who transfer from one department to another must begin at the bottom of the department to which they transfer, possibly resulting in a reduction in pay.

As of February 11, 1962, there were no Negro employees assigned to the job classifications then included in the following departments: Store Room, Process Control (Laboratory), Carpenter, Meter, Tool Room, Lubrication, Pipefit-ting, Electrical, Mechanical, Truck Shop, Pulp Mill (certain jobs), Board Mill, Board Mill Beater Room, Paper Mill, Paper Mill Beater Room, Shipping and Finishing, Painting and Insulating, Power and Laminator.

As of January 1, 1962, all of the employees assigned to the job classifications then included in the following departments were Negro: Stores Labor, Board Mill Labor, Paper Mill Labor, Pulp Mill Labor, General Yard, Shipping and Finishing Labor, Painting and Insulating Labor, Power Labor, Laminator Labor, Truck Shop Labor.

As of January 31, 1969, the race of the employees, by job classifications, then included in the Wood Preparation Department was as follows: The highest paying job was all-white, all lower paying jobs were all-Negro.

The departments to which only white employees were traditionally assigned contain higher-paying jobs, while the departments reserved for Negroes contain lower-paying, laboring jobs.

Certain of the departments formerly reserved for Negroes have now been merged with certain of the departments formerly reserved for whites, affording to Negroes who were assigned to those departments the opportunity to progress by promotion into lines of progression formerly reserved for whites. They are as follows: Truck Shop with Truck Shop Labor, August 1, 1962; Store Room with Stores Labor, August 1, 1969; Pulp Mill with Pulp Mill Labor, August 1, 1964; Paper Mill with Paper Mill Labor, August 1, 1969; Laminator with Laminator Labor, August 1, 1962; Painting and Insulating with Painting and Insulating Labor, August 1, 1962; Power with Power Labor, August 1, 1962; Shipping and Finishing with Shipping and Finishing Labor, August

2. There is some evidence to the fact that promotions have actually been based on job seniority, rather than departmental seniority. However, under either system, it is clear that employees at the plant can only accrue seniority for purposes of promotion in any given department after they have entered that department. Also, under the Labor Agreement, a senior employee may refuse a promotion by signing a waiver, giving up his right to advance.

1, 1969; Wood Receiving with Wood Preparation, August 1, 1969.[3]

The mergers were effected by simply arranging all of the jobs in the departments to be merged in descending rate-of-pay order. The resulting lines placed all the formerly white jobs above all the formerly Negro jobs. The entry job in the formerly Negro department became the new entry-level for the merged department.[4]

From January 1, 1965, to January 20, 1970, of 83 Negro employees hired, 67 were assigned to Negro job groups or Negro departments,[5] and 16 were assigned to white departments. During that same period, of 198 white employees hired, 187 were assigned to white departments, 1 was assigned to a Negro department, and the remainder were hired as Guards or Draftsmen.[6]

In light of the above facts, the plaintiff asks that the defendants be enjoined from discriminatory actions, and affirmative relief be afforded. 42 U.S.C.A. § 2000e–5(g).

## CONCLUSIONS OF LAW

This action is brought by the Attorney General on behalf of the United States pursuant to the provisions of 42 U.S.C.A. § 2000e–6,[7] seeking relief for alleged

3. The Company proposes future mergers of the Paper Mill with the Board Mill and Board Mill Labor Departments, and of the Shipping and Finishing with the Converting Department. This would not interfere with the safety and efficiency of plant operations, and would provide for employees in lower rated jobs a broader range of promotional opportunities to higher rated jobs.

4. To date, approximately 20 Negro employees have progressed to formerly white jobs in the merged departments. The Company employs almost 200 Negro hourly-rated employees.

5. 51 of those 67 were assigned to the Wood Preparation Department and to the General Yard.

6. Under the system for processing applicants for work which has been in effect at the plant at all times relevant to this action, a person who wished to apply for work at the plant was initially processed by a personnel officer. The initial processing consisted of an initial interview, followed by the applicant's completion of an application for employment if he so chose.

If, when a person applied for work, there existed vacancies for which requisitions had been submitted, and in which the applicant had expressed an interest, with few exceptions, the applicant was tested, the personnel officer who conducted the processing scoring the test. The scores were then recorded.

When the testing and recording of the scores had been completed, the personnel officer took the applicant to be interviewed by the head of the department where the vacancy existed. In instances where more than one applicant had applied for one job, the applicants were

taken to the department head individually. The choice among the applicants, and the decision whether or not to interview all applicants before making a choice, was then made by the department head.

When vacancies occurred simultaneously in more than one department, the choice of which applicant to refer to which department or departments was made by the initial interviewer.

When a vacancy occurred for which a requisition for a new hire had been submitted and had been approved by the general superintendent, the production manager, and the plant manager, applications for employment already on file were reviewed to determine whether any of the applicants qualified for the vacant job. If there were such applications on file, the chosen applicants were notified and asked to come to the plant. From that point, the procedure went as outlined above.

7. 42 U.S.C.A. § 2000e–6(a)—Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court * * * (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, et seq. This Court has jurisdiction of this action under 42 U.S.C.A. § 2000e–6 (a) and 28 U.S.C. §§ 1343(4) and 1345.

The defendant Continental Can Company is an employer within the meaning of 42 U.S.C.A. § 2000e(b). The defendant Local #12146 of District 50, United Mine Workers of America is a labor organization within the meaning of 42 U.S.C.A. § 2000e(d), and is engaged in an industry affecting commerce within the meaning of 42 U.S.C.A. § 2000e(a).

■ The Court finds that the operation of the departmental seniority system as it is now operated, violates Title VII § 703(a) of the Act.[8] The effect of the system is to freeze an entire class of Negroes into past discriminatory hiring and assignment patterns. The departmental seniority system operates to this effect against Negro employees still assigned to traditionally Negro jobs who must forfeit promotional security and suffer wage reductions in order to transfer to better jobs,[9] and also against Negro employees who, having been once assigned to traditionally Negro departments are now in other departments, but are without seniority credit which they were prevented from acquiring due to the previous racially exclusory policy practiced by the Company.[10] Local 189, United Papermakers and Paperworkers

v. United States, 416 F.2d 980 (5th Cir. 1969), cert. den., 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1969); Quarles v. Philip Morris, Inc., 279 F. Supp. 505 (E.D.Va.1968). See also, Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970).

■ Title VII of the Act requires that all employees have equal access to higher paying jobs for which they can qualify, without regard to race. Therefore, the departmental seniority system must be replaced with one reflecting the total length of service with the Company, or plant seniority, in all cases where Negro employees have been denied the opportunity to accumulate departmental seniority by the Company's past discriminatory assignment practices. Griggs v. Duke Power Co., *supra;* Local 189, United Papermakers and Paperworkers v. United States, *supra;* Quarles v. Philip Morris, Inc., *supra.*

■ However, the Company is not required to forego its legitimate interest in maintaining the skill and efficiency of its labor force and the safety of its operations. Title VII merely requires the removal of any procedures, standards or other structural impediments which are not required by overriding business necessity, but which serve to delay the attainment by Negroes of jobs, generally as good as those held by white

8. Title § 703(a), 42 U.S.C.A. § 2000e–2(a) reads as follows:
(a) It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

9. For example, Negro employees assigned to the General Yard must still transfer in

order to gain access to any formerly white jobs. Also, Negro employees in the now merged Wood Preparation and Receiving and Shipping and Finishing Departments have very limited promotional access to formerly white jobs because of the small number of formerly white jobs provided in those lines.

10. Departmental seniority requires that employees must compete for promotion with others in the same department. Thus, Negroes who, when they were hired, were not considered by the Company for assignment to "white" departments, but who have now transferred or who may hereafter transfer, are, under the system, junior to all whites hired into those departments prior to such Negroes' transfer dates.

contemporaries, or which force Negroes to pay a price for those opportunities. United States v. Local 189, United Papermakers and Paperworkers, 301 F.Supp. 906 (E.D.La., 1969).[11]

Negroes in the class discriminated against are entitled to compete for jobs for which they are qualified based on their plant seniority. Thus, they may skip jobs in lines of progression which do not provide training and experience essential to the performance of jobs above them in the lines of progression. Local 189, United Papermakers and Paperworkers v. United States, *supra*. Similarly, Negroes in the class discriminated against are entitled to compete for entry into lines of progression above the normal entry job, where the normal entry job does not provide training or experience essential to the satisfactory performance of higher jobs in the line of progression. *Id.*

In the case of jobs which provide training and experience necessary to the performance of higher jobs in the lines of progression, the Company may, as a condition of eligibility for promotion to higher jobs, impose residency requirements which are reasonably calculated to provide necessary training and experience in those jobs.

Since the only legitimate function to be served by such residency requirements would be to provide training and experience, that function could be as well served by time spent in jobs on temporary assignment as time spent on permanent assignment. Accordingly, time spent on temporary job assignments must be counted in the computation of any residency requirements.

The Court further finds that the practice of requiring employees who wish to transfer to traditionally white lines from which they were previously excluded on account of their race to suffer a reduction in pay and a loss of accumulated seniority as conditions of transfer constitutes a condition or term of employment which discriminates against such Negro employees on account of their race, in violation of § 703(a) of the Act.[12] Griggs v. Duke Power Co., *supra;* Local 189, United Papermakers and Paperworkers v. United States, *supra;* Quarles v. Philip Morris, Inc., *supra*. Consequently, such a policy must be enjoined.

Therefore, in short, the Court finds that the defendants have intentionally engaged in unlawful employment practices within the meaning of 42 U.S.C.A. § 2000e–5(g), and that the seniority system used by the Company prior to July 3, 1969 was not within the terms of 42 U.S.C.A. § 2000e–2(b). Therefore, the defendants will be enjoined permanently from the use of such a system, and the Court will order such affirmative relief as it deems appropriate.[13]

An order consistent with the above memorandum will be entered.

## ORDER

In accordance with the memorandum of the Court this day filed, it is adjudged, ordered and decreed that the defendants, their officers, agents, employees, servants and all persons and organizations in active concert or participation with them are hereby permanently enjoined and restrained from discriminating against present Negro employees at the defendant Continental Can Company's Hopewell, Virginia plant, or against any Negroes who apply for or obtain employment at said plant in the future, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e, et seq.

---

11. The parties have stipulated that in the event the Court found relief proper, any Negro employee hired on or after July 3, 1969, is not within the class of Negroes discriminated against. Therefore, the scope of this opinion applies only to Negroes hired before July 3, 1969.

12. See note 8, *supra*.

13. Back pay is not an issue in the instant case.

It is further adjudged, ordered and decreed as follows:

I. *Lines of Progression*

The lines of progression as contained in the collective bargaining agreement between the Company and the Union dated August 1, 1967, and as amended August 1, 1969, are revised and modified as set forth in Appendices A and B attached hereto.

II. *Affected Class*

A. The provisions of paragraphs III through V of this Decree shall apply to all Negro employees hired prior to July 3, 1969 who are currently assigned to the following departments:

Shipping, Finishing and Converting

Wood Preparation and Receiving

General Yard

Salvage

Painting and Insulating

Lubrication

Truck Shop

B. In addition, the provisions of paragraph V of this Decree shall only apply to all Negro employees hired prior to July 3, 1969, and who were initially assigned to some other department but are currently assigned to the following departments:

Paper/Board Mill

Pulp Mill

Power

Stores

III. *Transfer Rights*

A. The departments to which the members of the Affected Class, as defined in paragraph II A above, shall have an opportunity to be considered for transfer under the provisions of this paragraph are as follows (the "applicable departments"):

Paper Mill/Board Mill

Power

Process Control

Pulp Mill

Shipping, Finishing and Converting

B. For purposes of carrying out the transfer provisions of this paragraph III, each member of the Affected Class, as defined in paragraph IIA, shall have an opportunity to be considered for transfer to the applicable departments, either on a "continuing" or on a "vacancy-by-vacancy" basis.

1. To be considered on a "continuing" basis for any and all applicable vacancies in each of the applicable departments, a member of the Affected Class must signify his desire on a form to be furnished by the Company. This election may be exercised at any time within eighteen months of the date of this Decree. All rights under paragraphs III through V of this Decree shall terminate as to any member of the Affected Class who has not made such an election within the eighteen month period, except to the extent that the provisions of paragraph V are applicable to promotional rights in the department to which the employees are currently assigned.

2. With respect to "vacancy-by-vacancy" consideration, each vacancy in an applicable job shall be listed for three (3) days on a notice to be prominently displayed in the clock house. To be considered for transfer on this basis, a member of the Affected Class must signify his desire on a form to be furnished by the Company within three (3) days after the day when the notice of the vacancy was first displayed. A request for transfer on this basis shall entitle the employee to consideration only for the specific vacancy for which the request was made.

3. In administering the provisions of subparagraph B 2 above, for a period of three (3) months from the effective date of this Decree, the Company shall display in the clock house a notice of each applicable vacancy. Thereafter, for a period of fifteen (15) months, the Company shall display a notice of each applicable vacancy, unless sufficient interest is not shown in an applicable de-

partment by members of the Affected Class defined in paragraph II A above. For this purpose, lack of sufficient interest in an applicable department will be inferred when there have been three consecutive, posted vacancies in that department for which no requests are received, provided that the third posting occurs later than one month after the first.

C. A roster shall be prepared and maintained for each applicable department of the members of the Affected Class who have elected to be considered for transfer pursuant to the provisions of paragraph III B. The names of all other employees who have filed transfer requests to the applicable departments pursuant to Article IX, Section 3 of the Labor Agreement shall be added to the rosters.

D. The employees on the applicable rosters shall be given preference over new hires for all applicable vacancies in the applicable departments. These vacancies are as follows:

Process Control—entry level job;

Pulp Mill—Pulp Mill Helper or below;

Paper Mill—Sixth Hand or below;

Power Department—Power House Helper or below;

Shipping and Finishing and Converting—Shipping Clerk or below, and/or Converting 1st Helper or below.

If the vacancy is in a job above the lowest job in a line of progression, the incumbents in the lower-rated jobs in that line of progression shall be added to the roster.

E. In filling vacancies in the jobs listed in subparagraph D above, the Company may select the employee on the applicable roster with the greatest relative ability and diligence. Whenever the ability and diligence of the competing employees is relatively equal, length of service with the Company shall be determinative.

F. If a member of the Affected Class refuses an offer to transfer, he shall have no further rights under this Decree with respect to the job offered.

IV. *Red Circling*

A. When a member of the Affected Class transfers pursuant to the provisions of paragraph III, he shall continue to receive the straight time hourly rate of pay for the job to which he was permanently assigned prior to transferring (the "Red Circle" rate) until he is assigned to a position paying a higher rate.

B. From the effective date of this Decree, in no event shall such "Red Circle" rate exceed $3.50 per hour (straight time). On the effective date of the next revision of the Labor Agreement later than August 1, 1970, the ceiling of $3.50 herein provided shall be increased by a percentage equal to the percentage of the general hourly wage increase agreed to in the next revision by the Company and Union.

C. The "Red Circle" protection provided in the paragraph shall apply to only one transfer made pursuant to this Decree for each member of the Affected Class.

D. The provisions of the Labor Agreement governing lay-offs (Article IX, Section 1) shall remain in full force and effect, provided however, that "Red Circled" members of the Affected Class who are transferred or demoted as a result of reduction in force, equipment breakdown, or other event over which they have no control shall continue to receive the "Red Circle" protection provided herein.

V. *Promotional Rights*

A. In selecting employees for permanent or temporary (V.S. & T.) promotions, the Company shall give consideration, in determining the qualifications of the employees, to ability, diligence and departmental seniority. Whenever the ability and diligence of the competing employees are relatively equal, departmental seniority shall be determinative; provided that in all instances in which

one or more of the competing employees is a member of the Affected Class, the departmental seniority date for both the Affected Class employees and nonaffected employees shall be the same as their respective dates of employment. In all other circumstances, departmental seniority shall be computed in accordance with the Labor Agreement and the practice thereunder.

B. Except as modified by this Decree, promotions and demotions will continue to be made in accordance with the lines of progression set forth in the then applicable collective bargaining agreement; provided that all members of the Affected Class defined in paragraph II above may, for purposes of permanent and temporary promotions, by-pass any jobs in lines of progression, whether at or above the entry level, which do not provide training and experience essential to the satisfactory performance of jobs above those jobs in their respective lines of progression. The jobs which do not provide training and experience essential to the satisfactory performance of jobs above them, as stipulated by the parties, and the lines of progression in which those jobs are placed, are as follows:

*Paper Mill/Board Mill*
Lift Truck Operator
Utility Man
Utility Helper

*Pulp Mill Lines*
Lift Truck Operator
Utility Man
Utility Helper
Digester Loader

*Shipping & Finishing and Converting*
Lift Truck Operator
Tier
Scale Man
Utility Man
Utility Helper

*Power*
Utility Man
Utility Helper

*Painting & Insulating*
Pipecoverer Utility Man
Painting Utility Helper

*Process Control*
Tall Oil Operator

C. Notwithstanding the foregoing, the Company shall not be required to consider any employee for promotion who (1) has not satisfied a reasonable residency requirement for the job to which he is permanently assigned at the time the vacancy occurs; and/or (2) does not have the qualifications and ability to perform the vacant job. The applicable residency requirements shall be set by agreement of all parties.

VI. *Craft Departments*

In filling vacancies in the entry-level positions in the Electrical, Mechanical, Pipefitting, Meter and Carpenter departments, the Company will give preference to qualified incumbent employees who have requested transfers to those departments under the provisions of Article IX, Section 3 of the Labor Agreement. In filling said vacancies, length of service with the Company shall be determinative whenever the ability and diligence of the competitive employees is relatively equal. Whenever a member of the Affected Class defined in paragraph II A above is transferred to one of the craft departments, he will be accorded Red-Circle rate protection as provided in paragraph IV above.

VII. *Hiring and Assignment*

Whenever vacancies occur which, consistent with the terms of this Decree and of the Labor Agreement, may be filled by the assignment of new hires, such vacancies shall be filled in accordance with the provisions of this paragraph VII.

A. All applications for employment accepted by the Company will be considered "active" for one (1) month from the date submitted. An applicant may renew the "active" status of his application by so informing the Company within three business days before the termi-

nation of the "active" period of his application. Any application thus renewed will, for purposes of priority in hiring as provided below, continue to be considered as having been filed on the date originally filed.

B. In filling vacancies, the Company may select the applicant with the greatest relative qualifications for the vacant job. Whenever the qualifications of the applicants with an "active" status are relatively equal, openings shall be offered to the competing applicants in the order in which the applications were filed.

C. If an applicant is eligible to be considered for hire under the terms of this paragraph, he shall be offered the opportunity to choose among any then existing vacancies for which the Company determines that he is qualified.

D. The Company may require applicants for employment to demonstrate that they possess the ability to read, write, and do mathematics of the type typically performed in the department or departments where vacancies exist. It will be inferred that an applicant who graduated from high school possesses the requisite abilities, but no such inference will be made for applicants who have not so graduated. Either of these inferences can be rebutted, and all applicants who are not high school graduates will be given the opportunity to demonstrate that they possess the requisite abilities by completing tests of reading, writing, and mathematic skills. All such applicants who successfully complete these tests will be considered to possess abilities equivalent to those possessed by high school graduates. In determining the qualifications of applicants, the Company may use any other criteria which are not adopted for the purpose or with the effect of systematically discriminating on the basis of race.

E. Except as provided in this Decree the Company shall not use any test instrument unless its use has been approved by the Court or it has been locally validated at the Hopewell plant. If the Company elects to conduct local validation studies for any test instrument, summaries of such studies will be filed with the Court and served on counsel for all parties, together with appropriate supporting data. Any instrument so validated may be placed in use by the Company, if, within 45 days of the service of the validation study and supporting data, no objection to the use of such test has been filed by any party to this action.

VIII. *Waivers*

On the effective date of this Decree, all waivers then in effect as to any employee at the Hopewell plant shall be of no further force and effect. No employee who would otherwise be eligible for any relief under this Decree will be deemed ineligible for any such relief on account of a waiver or waivers signed by him prior to the effective date of this Decree. Notwithstanding the foregoing, however, Article IX, Section 1 paragraph 3 of the Labor Agreement (the waiver provision) shall continue in full force and effect on and after the effective date of this Decree.

IX. *Qualifications*

Notwithstanding any other provision of this Decree, the Company shall not be required to place any person in a job who does not have the qualifications to perform said job.

X. *Training*

The Company will provide training, in order of seniority, to qualified employees for all jobs to which they are eligible for permanent, temporary, or casual assignments. Such training on jobs above the jobs to which such persons are assigned shall commence and proceed as quickly as is practicable after assignment to particular jobs.

XI. *Application of this Degree*

This Decree shall apply only to Continental Can Company, Inc.'s paper plant at Hopewell, Virginia.

## XII. *Seniority List*

As soon as practicable, but in no case later than the effective date of this Decree, the Company shall prepare and post conspicuously throughout the mill a seniority list showing, at least, for each employee, his date of employment, his date of departmental assignment and his date of job assignment. Copies of said list shall be furnished to counsel of record for all parties.

## XIII. *Records and Reporting*

Commencing ninety (90) days from the entry of this Decree, and then quarterly during the following twenty-one (21) months, the Company shall furnish counsel of record for all parties appropriate summaries in regard to the following: active applications, inactive applications, new hires, rejected applicants, job refusals, job requisitions, employee advancements, waivers, transfers, and terminations.

## XIV. *Retained Jurisdiction*

This Court shall retain jurisdiction of this cause to enter all Orders necessary to, and appropriate for the effectuation of the provisions of this Decree.

APPENDIX "A"

Note:  Present Hydrapulper Operators in Board Mill would be reclassified as 6th Hands. Hydrapulper Operator functions would be a function performed by 6th Hands coming up the lines of progression.

[A2948]

<u>APPENDIX "B"</u>

<u>CONVERTING, SHIPPING AND FINISHING DEPTS.</u>

**Note:** This Chart eliminates Converting 2nd Helper position.
This Chart combines present Clean Up Man and Utility Helper positions into the Utility Man position.