Charlie MILLER, Harry L. Brown, Sr., Moses K. Baker and Reedy Thomas, on behalf of themselves and all others similarly situated, Plaintiffs,

International Association of Machinists and Aerospace Workers and Local No. 23, Plaintiff (by realignment as such)

v.

CONTINENTAL CAN COMPANY, INC.; Local No. 576, United Paper Makers and Paper Workers (AFL-CIO); Local No. 638; International Brotherhood of Pulp, Sulphite and Paper Mill Workers (AFL-CIO), Defendants.

Civ. A. No. 2803.

United States District Court,
S. D. Georgia,
Savannah Division.

Jan. 30, 1981.

Jack Greenberg, Judith Reed, Herbert Teitelbaum, New York City, Bobby L. Hill, Savannah, Ga., for plaintiffs.

Willis S. Ryza, Pope, Ballard, Shepard & Fowle, Ltd., Chicago, Ill., Spencer Connerat, Jr., Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, Savannah, Ga., Benjamin Wyle, New York City, James E. McAleer, Jr., Savannah, Ga., Frederick C. McLam, Decatur, Ga., Patrick M. Scanlon, Atlanta, Ga., Charles L. Sparkman, Savannah, Ga., for defendants.

## ORDER

EDENFIELD, District Judge.

By an Order entered December 28, 1979, this Title VII and § 1981 employment discrimination case was reopened for reconsideration, particularly with respect to the Supreme Court decision in *United States v. Teamsters*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Since that time the Court has permitted additional discovery and entertained argument relating to the origins and nature of seniority policies at the defendant Continental Can's Port Wentworth, Georgia pulp and paper mill, which is the subject of this litigation. The Court has also examined certain arguments with respect to salaried and clerical positions, especially in light of *Hazelwood School District v. United States*, 433 U.S.

299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). In addition, the Court has conducted an extensive examination of the voluminous record developed in this case prior to the Order of the late Judge Alexander A. Lawrence of August 18, 1976, which is the basis of this review.[1]

In the following pages, I shall first describe the organization of the mill which is the subject of this case,[2] and the conclusions which Judge Lawrence reached in his original consideration of employment practices at the plant. Second, I will consider these findings with respect to salaried and clerical positions, particularly in light of *Hazelwood* and certain problems raised by the evidence presented on these issues and the manner in which this evidence was considered in the Order of August 18, 1976. Third, I shall describe the issues raised by *Teamsters*, with emphasis on the definition to be given "the seniority system" under the facts in this action. This seniority system will then be considered under *Teamsters* and related cases, particularly *James v. Stockham Valves and Fitting Co.*, 559 F.2d 310 (5th Cir. 1977) and *Swint v. Pullman-Standard*, 624 F.2d 525 (5th Cir. 1980).

1. The complexity and, indeed, the sheer bulk of records developed in employment discrimination cases have been the subject of much judicial comment. Thus, the Court in *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157 (1978) notes that complex employment discrimination litigation often rivals "even the most notorious antitrust cases" so as to become a "judicial paleolithic museum piece." *Pettway IV*, at 1168. The present action is just such a giant "museum piece." The transcript of the original trial which was conducted in August and September, 1973, fills over two thousand pages, with exhibits that must add several thousand more to the record. This burden has been further enhanced by extensive post-trial memoranda as well as briefs, exhibits and other materials associated with the present reconsideration. Moreover, this Court has been further hampered by its own unfamiliarity with the development of the litigation. Extensive review of the record has done much to alleviate this problem, but, nonetheless, the Court doubts that any amount of study could fully replace the expertise developed by Judge Lawrence who "lived with" this litigation for approximately eight years.

2. The paper industry has, of course, been a major source of litigation in the field of employment discrimination. See, *e.g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). *Myers v. Gilman Paper Corp.*, 556 F.2d 758 (5th Cir. 1977); *Rogers v. International Paper Co.*, 510 F.2d 1340 (1975), *remanded* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); *Stevenson v. International Paper Co.*, 516 F.2d 103 (5th Cir. 1975); *Long v. Georgia Kraft Co.*, 450 F.2d 557 (5th Cir. 1971). In fact, the *Crown Zellerback* decision in the Fifth Circuit which *Teamsters* rejected involved one of the present defendants as name party. *Local 189, United Papermakers and Papermakers, AFL–CIO, CLC v. U. S.*, 416 F.2d 980 (5th Cir. 1969). Nor is the defendant Continental a stranger to Title VII litigation. *U. S. v. Continental Can Co.*, 319 F.Supp. 161 (1970) (case involving the company's Hopewell, Va. paperboard and kraft paper products plant). These and other cases present many of the problems and practices which confront us here, though many were completed prior to the complications introduced by *Teamsters*. See, especially, *Rogers, supra*.

Based upon these analyses I have concluded that Judge Lawrence's Order must be substantially revised with respect to salaried and clerical positions at Port Wentworth. However, the Court also determines that seniority policies were in significant part not bona fide within the meaning of *Teamsters* and, hence, that substantial relief is due employees who were subject to these policies. The bases and consequences of these conclusions are developed below.

I. *Factual and Legal Background*

A. *History and Organization of the Port Wentworth Mill* [3]

1. Pre-Civil Rights Act Employment Policies

The Port Wentworth mill was opened in 1948 under the ownership of the Southern Paperboard Corporation. Continental Can Company acquired the mill in about 1960. The mill is similar to other plants in the pulp and paper industry in its functions, organization, personnel practices and equipment. FF 15. The primary activity at the plant is the making of liner board used in the production of corrugated containers. Tr. 1119.

Production is carried out in one continuous process involving the making of paper and recovery of the chemicals which are used in this process. Wood is brought into the plant in either logs or chipped form. These raw materials are prepared for chipping and storing in an area of the plant known as the wood yard. Wood chips are then mixed and cooked in a separate pulp mill. The papermaking process is completed on a "paper machine," the fourdrinier. Tr. 1119–30. Total employment at the plant has, of course, varied, and there has been a general downward trend especially in the production areas since 1965. At the time of trial there were approximately 450 employees at the plant, 250 in production jobs, about 100 in the maintenance crafts,

and about 100 non-union salaried employees. FF 14.

The Port Wentworth mill is divided into departments according to functional lines with union representation reflecting this structure. The UPIU represents all hourly paid workers in the production departments. Local 638 represents employees in the wood yard, pulp mill, and Power Departments. It also represents Labor Pool employees. Local 576 represents employees in the paper mill, laboratory, and stores departments. UPIU also represents through Local 638 instrument mechanics and helpers. Local 536 also represents insulators, boilermakers, carpenters, painters, motor mechanics, diesel mechanics, welders and their helpers and the knife grinder. FF 10. IAM and Local 23 represents machinists, millrights, oilers and helpers. IBEW and Local 1391 represents electricians, electronic and refrigeration, and their helpers. UAJ and Local 188 represents pipefitters and their helpers. FF 11. In addition to these bargaining units, there are non-union personnel in clerical, sales, supervising, managerial and professional-technical positions. FF 12.

Each production department is further organized into one or more lines of progression (LOP), which at least in the ideal, group positions so as to allow the employee to learn skills in one job which will allow "progression" to the next higher, more lucrative position. Maintenance jobs are not grouped into formal LOPs, but there is a similar settled pattern of progression in each craft from helper or apprentice to journeyman and leadman. FF 13.

The exact composition and organization of the various LOPs has been subject to change as the equipment and organization used in the production process changed over the years of plant operation, but there are several points of particular interest here.

3. The information contained in this portion of the Order is drawn largely from Judge Lawrence's Findings of Fact, "FF," which include references to the appropriate portions of the trial transcripts and other materials. Where reference is made to facts in the transcript not directly used by Judge Lawrence, they will be denominated by "Tr." and the applicable page reference. All descriptions are intended to reflect conditions as they existed at or before the trial date, i.e., August, 1973.

By far the most significant fact is that from the time of the opening of the mill until January, 1965, black employees were hired only into one of the then-existing two wood yard LOPs. This LOP, which lead to a top position known as "chipper feeder," contained laborer positions involving use of some manually-operated tools. The top job in this LOP paid less than all but a few of the jobs in the other, exclusively white LOPs and the maintenance crafts. In most other departments, a job only one or two levels above the entry position in the LOP paid as much or more than the top black position. The company concedes that prior to 1963 a policy of segregation with respect to black employees in physical facilities as well as these LOPs was followed. FF 16. In the wood yard, skilled positions, service man, tractor operator, crane operator, and woodroom operator, were grouped as a separate, white LOP. FF 18.

Prior to January, 1965, the ordinary promotional pattern for newly hired employees was, for blacks, from woodhandler upward to chipper feeder. Whites were hired into the labor pool ("bull gang") and then promoted into the various other production and maintenance LOPs according to seniority, qualifications, and job availability. FF 21. Whites could also be hired directly into skilled positions where they had appropriate prior training. FF 20. No black was hired or transferred into any traditionally white LOP until late 1968. The first black was hired into a salaried position in 1969. The first black hiring into the labor pool occurred in late January, 1965. FF 19. This segregation of the labor pool was particularly significant since it meant that black employees went directly "out the gate" when layoffs occurred. Whites in the other LOPs enjoyed the exclusive right to bump into the labor pool on the basis of their mill seniority. FF 23.

Union memberships reflected the pattern of segregation in plant operation. The defendant UPIU is successor in interest to the IBPS (International Brotherhood of Pulp, Sulphite, and Papermill Workers (AFL–CIO)). This union maintained Local 653 exclusively for black workers in the chipper feeder LOP. Local 638 represented white workers exclusively until approximately October, 1965, when it was merged with Local 653. Local 576 of the UPP (United Paper Makers and Paper Workers (AFL–CIO)), the other predecessor in interest to defendant UPIU, had no black members until about 1968. At the time of trial, none of the craft locals associated with IAM, IBEW, or UAJ had ever had any black members. FF 25, 26.

## 2. Changes In Racial Patterns

Beginning in 1963, Continental made a number of significant efforts to alter racial patterns at the mill. Initially, the company moved to desegregate physical facilities such as locker rooms and dining areas under a "Joint Statement on Plans for Progress" entered into with the President's Committee on Equal Employment Opportunity. FF 27. As was noted above, important changes also began in hiring practices at about this time. The first black was hired into the labor pool in January, 1965, and plaintiffs do not claim any discrimination in hiring after this time. FF 28. Under union contracts negotiated around 1965, blacks were also accorded a right of transfer out of the chipper feeder LOP. However, none did so until late 1968, and the first black hired into the labor pool did not obtain a permanent job in an LOP until March, 1968. FF 31, 32.

More significant perhaps were changes relating to the wood yard LOPs. Segregated locals were eliminated effective January 1, 1966. This step did not change the LOPs. FF 30. However, the company had begun negotiating with the IBPS toward merging the LOPs as well in early 1966. The Union stiffly resisted this change at least insofar as it would have given senior black chipper feeders promotional rights superior to two junior white laborers then on long-term temporary set-ups in the white LOP. President Kelly of the white local attempted to gain waivers from eight blacks to secure the positions of these two white laborers. However, all the necessary waivers could not be obtained, and, ultimately, in October,

1967, the union accepted in principle loss of the two whites' seniority advantage. FF 41.

Finally, the two wood yard LOPs were merged effective January 1, 1968. The revised system placed all blacks below the formerly white jobs in the order of their wage rates. Job seniority was carried over to the new system, but senior blacks nonetheless remained behind junior whites who, of course, retained their old positions. Advancement in the new unified LOP continued to be based on job seniority as had been true under the former dual LOP system in the wood yard. FF 42. There were, however, at least some instances of apparent failure to observe this policy. FF 43, 45.

These changes opened up at least the theoretical possibility for blacks to enter formerly all-white positions. But, even in 1972, no black held any of the higher wood yard positions. FF 44. Moreover, in 1968, only one black worked in any LOP outside the wood yard. FF 40. At least one reason for this problem was the fact that blacks transferring out of the wood yard LOP would then have lost all seniority rights relating to layoffs or further promotion. Seniority for these purposes was based only on job tenure, and the transferring black, despite long tenure in the wood yard would be classified as a "new man." FF 39.

There was apparently general recognition of the barriers still facing long-term black employees who might wish to transfer out of positions held under former segregationist mill arrangements. Thus, the company and the UPIU began developing a "Memorandum of Agreement" in late 1970 to provide remedial seniority and transfer rights to blacks hired at the mill before January 1, 1965, i.e., "the affected group." This agreement was originally drafted by division management and adopted with little change. However, "residency periods" required for progression to top wood yard jobs were reduced from proposed six to twenty-four months in the various positions to one month each, after objections from black employees, notably the plaintiff Mr. Miller. FF 46, 47.

The Memorandum was signed on August 14, 1971, by representatives of Continental, IBPS and Local 638 and UPP Local 576. FF 48. The "affected group" covered by the memorandum included forty-five blacks [4] and applied to the bargaining unit represented by the signatory unions. FF 49. It provided no privileges relative to craft units represented by the IAM, IBEW, and UAJ. FF 53. Under the agreement permanently vacant entry level jobs in any covered LOP were offered in order of mill seniority to qualified members of the affected group first. Jobs were considered permanently vacant when no employee had recall rights to them, as in fact might have been true of junior whites who had been laid off. FF 50. The agreement also gave blacks rate protection, guaranteeing that upon transfer they would be paid at the lesser of either their prior level or the prevailing chipper feeder rate. FF 49. Upon transfer, blacks also kept their accumulated mill seniority for purposes of layoffs and demotions. FF 51.

These rights were, however, subject to forfeiture. If one in the affected group declined a transfer offer under the Memorandum, he was deemed to have waived all rights under it as to future openings in that LOP. Similarly, a waiver of promotion within an LOP negated future opportunities within that LOP to use mill seniority or rate protection under the Memorandum. FF 57. Almost all members of the affected group have subjected themselves to these forfeiture provisions with respect to at least one LOP. Reasons cited for these waivers included (1) a belief that wage protection was inadequate, (2) the fact that maintenance-type jobs brought exposure to layoff, and (3) the allegedly unattractive nature of

---

**4.** According to documents supplied to the Court by Continental, only 35 of these employees remained with the company as of August, 1974. Defendant Continental Can Company, Inc.'s Response to the Post-Trial Memorandum for Plaintiffs, August 26, 1974. As of August, 1980, only 21 remained at Continental. Stipulation Exhibit M. Therefore, the practical impact of any award of seniority sustained here on plant operation would seem to be slight.

entry-level jobs in formerly all-white LOPs. FF 58. The combined impact of these or other considerations was that, in February, 1972, production LOPs remained almost as completely segregated as had been true in 1968. FF 61.

Changes in maintenance or craft jobs were, if anything, even more limited. Prior to 1965, blacks were, of course, excluded from these positions as a matter of company policy. During this period and until 1971, the company generally filled openings by on-the-job training of helpers selected from the labor pool. FF 64. The first member of the affected group was not assigned to the labor pool until 1969, and none had received more than temporary assignment to a craft helper position by the time of trial. FF 65. These positions were unattractive to blacks because they required relinquishing mill seniority upon transfer, and, in any event, the helper program was eliminated by Continental in March, 1971. Thereafter, journeymen craftsmen were generally hired directly off the street. Thus, craft jobs were effectively closed to blacks already with the company. FF 70.

As of February, 1972, Continental also had fifty-two employees in supervisory positions. Until just before trial, no black had ever held a supervisory position on a permanent basis. Only one black, Mr. Frank Williams, had served as a temporary supervisor. Approximately half of these supervisory positions involved highly technical work for which only engineering graduates with specialized training were qualified. No blacks were available to fill these positions during the period at issue. However, the remaining jobs were in shift or departmental supervision which did not require specialized expertise. Thus, the company selected employees for these positions from the maintenance craft or production workers, including some who had begun as laborers. FF 73.

Continental also employed approximately thirty clerical workers. Only three blacks had occupied any of these positions by the time of trial. All three were currently employed in this clerical group. FF 76. One, Mr. Franklin Webber, testified at trial concerning the circumstances surrounding his obtaining his position as production records clerk. Mr. Webber indicated that he had worked as a records clerk while in the military. He also had completed about one and a half years of study at Morehouse College and additional academic work at Savannah State College while employed by Continental. He first worked at the mill as a temporary employee in the wood yard, beginning in 1965. Thereafter, he worked intermittently, and then regularly in the wood yard and as a laborer. The company was aware of his background, but Mr. Webber was told that only laborer-type positions were available when he initially applied. Thereafter, he did not seek clerical work. However, in January, 1969, he was approached by management and offered the clerical position he held at the time of trial. FF 77, 78.

With respect to salaried positions, the plaintiffs also presented testimony from Mr. Frank Williams. Mr. Williams had a seventh grade education. He had been employed at the mill since 1948 when he began as chauffeur for the plant manager. Thereafter, he worked for twenty-three years in the wood yard. Mr. Williams left the wood yard in 1970 for a temporary assignment as store room truck driver. Later, after cut-back to a laborer position for a time, he sought and, after several requests, gained a position as yard foreman supervising a labor gang of five to ten workers. FF 74, 75. The company provided special training for him to gain necessary familiarity with overall mill operations which he lacked because his prior experience had been largely confined to the wood yard. Tr. 1516.

B. *The Present Litigation and Judge Lawrence's Order* [5]

This venerable litigation commenced on May 6, 1971, when plaintiffs Charlie Miller,

---

5. This section is, of course, derived largely from Judge Lawrence's Conclusions of Law

("CL"). Where materials are taken directly from the trial transcript, they will again be

Harry L. Brown, Sr., Moses K. Baker, and Reedy Thomas, all long-term employees at Port Wentworth, filed suit against the defendant company, IBPS and its Local 638, UPP and its Local 576, IBEW and its Local 1391, IAM and its Local 23, and UAJ and its Local 188. This complaint was based upon EEOC charges filed against the several defendants on October 22, 1969, and November 23, 1971. "Right to Sue" letters were thereafter issued by EEOC, and any defects in this proceeding were held cured by Judge Lawrence in his Order of April 3, 1973.

On May 22, 1973, an Order was entered permitting IAM and its Local 23 to realign as parties plaintiff. The Union's theory for this realignment was that company policy had prevented hiring of qualified blacks for the IAM bargaining unit. The relief requested was similar to that sought by the plaintiffs, and, in fact, IAM had itself already consented to all changes sought by the plaintiffs. Tr. 1045. At the conclusion of plaintiffs' presentation, August 30, 1973, the IBEW and its Local 1391 were granted dismissal by Judge Lawrence upon his finding that no contacts, discriminatory or otherwise, had been established between blacks at Port Wentworth and these defendants. Earlier in the litigation, Judge Lawrence had also dismissed the IAM claims on grounds of defective service of process, subject to their being bound by any injunctive relief which might prove necessary.

Thus, the parties to this litigation were in 1973, as they are now, the plaintiff mill workers and the IAM unions. On the defendant's side, there remained Continental and UPIU, which had been created by the August, 1972, merger of the IBPS and UPP. The IBEW remained in the case only to seek attorney's fees under *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 419, 98 S.Ct. 694, 699, 54 L.Ed.2d 648 (1978).

The proceedings of August and September, 1973, were conducted on the limited issues of the liability *vel non* of the defendants and injunctive relief, with matters relating to actual back pay and attorney's fees reserved for later determination. Or-

der of April 3, 1973. Jurisdiction over Continental Can is based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and under the Civil Rights Act of 1866, 42 U.S.C. § 1981. CL 3. Jurisdiction over UPIU and Local 638 is similarly based on Title VII and § 1981. CL 4. Jurisdiction over UPIU Local 576 is based on § 1981 only. CL 5. Jurisdiction over IAM and Local 23 was originally based on Title VII and § 1981. Realignment did not remove jurisdiction over collective bargaining agreements for purposes of injunctive relief. CL 6. Jurisdiction over the IBEW and Local 1391 was based on Title VII and § 1981. CL 7. As was indicated earlier, the IAJ Unions were dismissed from the suit subject to coverage under injunctive relief. No objection was then made by plaintiffs, and no attempt was made at trial to show discrimination by these Unions. Plaintiffs' later attempt to reinstate IAM under § 1981 was denied by Judge Lawrence in the Order here described. CL 8.

Judge Lawrence's Order is premised upon an initial division of blacks at Port Wentworth into two subclasses for purposes of relief. Subclass "B" consisting of all blacks hired at the mill since January 27, 1967, approximately two years before the first EEOC charges were filed, was granted general injunctive relief. However, since blacks hired after January, 1967, were accorded equal opportunity to enter production lines of progression, no relief relating to seniority or back pay in these job categories was permitted. CL 9. Blacks hired prior to January, 1965 were considered as a separate subclass.

With respect to salaried and clerical positions, Judge Lawrence did not base his finding that discriminatory practices had prevailed at Port Wentworth upon any direct comparison of statistical evidence. In fact, no data was presented to establish the percentage of blacks in any specific population who might have qualified for these jobs. Instead, it was held that the obviously small representation of blacks in these jobs was

noted by "Tr." and the applicable page refer-       ence.

sufficient in itself to establish a prima facie case of discrimination. CL 19. This conclusion was reached despite the fact that Continental's admitted practice of limiting blacks to the wood yard LOP until 1965 and the only very slow changes occurring thereafter necessarily meant that few, if any, blacks could have reached the higher positions in craft or other LOPs from which supervisors were selected. DX 25. Apparently, the determination was based in significant part on an erroneous belief that supervisory personnel were frequently taken from lower levels in the various departments. See FF 73 and PX 11. Furthermore, it did not reflect any consideration of the number of vacancies which developed in these job categories subsequent to the passage of Title VII.

The other subclass identified for purposes of relief was denominated group "A." Judge Lawrence premised his conclusions with respect to Subclass A on the then-prevailing law in the Fifth Circuit. *United Papermakers and Paperworkers v. United States*, 416 F.2d 980, 988 (5th Cir.). Under this rule, any employment practice which perpetuated the effects of pre-Title VII discrimination was unlawful. CL 10. Judge Lawrence thus reasoned that "[a] system of granting promotion and transfers based on job and departmental seniority where racially segregated departments have existed in the past and which tends to perpetuate such segregation is unlawful under Title VII." CL 12.

After discussion of discrimination with particular reference to the LOP residency requirements, CL 13, transfer policies, CL 14, posting of job vacancies, CL 15, and salaried and clerical positions, CL 16, Judge Lawrence moved to development of remedies under the "rightful place" theory. CL 17. Of central interest here is the determination that "[m]embers of Subclass A are entitled to use their accumulated mill seniority when (a) competing for transfer to any job covered by a collective bargaining agreement, (b) for promotion to any job for which seniority is a factor to be considered

for promotion under the applicable agreement, and (c) for any purpose for which seniority is used." CL 22. Also, particularly significant for present purposes is the finding that the UPIU and Locals 638 and 567 were in violation of Title VII and § 1981, respectively, by their participation in contracts with Continental which effectuated illegal promotion and transfer policies. CL 31, 32. Relief was, however, limited to modifications of the Unions' bargaining agreements necessary to effectuate the injunctive relief granted with respect to Continental.

II. *Salaried and Clerical Positions*

In the Order of December 28, 1979, this Court indicated only that reconsideration would be entertained with respect to *Teamsters* and the seniority system at Port Wentworth, which governed hourly employees. However, defendant Continental Can argued in its memorandum of July 12, 1977, and continues to argue that substantial revision of Judge Lawrence's opinion is required not merely by the *Teamsters* seniority holding, but also under it and several other intervening Supreme Court rulings with respect to other aspects of Title VII. Continental points to three cases in particular: (1) *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), concerning class action principles; (2) *United Airlines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), concerning questions of timeliness and evidence; and (3) *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), concerning use of statistical data. Continental also points to problems in Judge Lawrence's interpretation of Plaintiff's Exhibit 11, which were briefly discussed above. After examination of these arguments, I conclude that relief with respect to salaried and clerical positions cannot be sustained under a proper interpretation of the evidence before the Court and the cautions expressed in *Hazelwood* and also *Teamsters*. The Court will therefore find it unnecessary to consider

**218**

here defendant's arguments under *Evans*[6] and *Rodriguez*.

■ As must have been apparent in the description of Judge Lawrence's findings, evidence of discrimination with respect to salaried and clerical workers could hardly have appeared overwhelming from any perspective. At best, it consisted only of reference to (1) the small number of blacks in these categories, considered without reference to the number of post-Act vacancies, (2) the view that Continental regularly drew supervisory personnel from lower rungs of the various LOPs, and (3) the specific experiences of Mr. Webber and Mr. Williams. However, after *Teamsters* and *Hazelwood*, it is clear that a paucity of black employees standing alone need not be sufficient to establish a prima facie showing of discriminatory "pattern or practice." The Supreme Court has analyzed the import of such gross discrepancies in racial representation as follows:

> In *Teamsters*, the comparison between the percentage of Negroes on an employer's work force and the percentage in the general areawide population was highly probative, because the job skill there involved—the ability to drive a truck—is one that many persons possess or can fairly readily acquire. When special qualifications are required to fill particular jobs, comparison to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.

*Hazelwood*, 433 U.S. at 308, n.13, 97 S.Ct. at 2742, n.13. See also *Hill v. Western Electric Co.*, 596 F.2d 99, 104 (4th Cir. 1979); *Miller v. Weber*, 577 F.2d 75, 77 (8th Cir.

1978); *Roman v. ESB, Inc.*, 550 F.2d 1343, 1354–1355 (4th Cir. 1976). Furthermore, it has also been well settled that the plaintiff has the burden of producing a meaningful statistical comparison to make out his prima facie case of discrimination. *Miller, supra*, at 77, citing *James v. Wallace*, 533 F.2d 963, 967 (5th Cir. 1976).

■ Judge Lawrence's Order establishes that there were few black employees at the plant in any positions outside the wood yard and labor pool during the relevant period. FF 60, 61, 65. Thus, the only basis possible for seeing real disparity[7] in salaried jobs would be the use of broad population proportions, though in fact there was no evidence presented or finding made with respect to even the general racial composition of the Port Wentworth or Savannah area. It appears then that the small number of black clerical and salaried employees standing alone cannot be considered significant unless it is established that, as in the case of truck drivers, skills needed for these positions can be expected to be widely distributed in a general population having a substantial black component. This is not a case where one can merely assume "that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded." *Mayor v. Educational Equality League*, 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974).

Of course, with respect to supervisors, any argument that the absence of blacks standing alone supports an inference of discrimination is untenable in light of Judge Lawrence's amply supported findings concerning the complexity of the mill, the com-

---

**6.** The defendant company also raised certain arguments under *Evans* with respect to the seniority system and whether it was bona fide within the meaning of *Teamsters*. However, it .is clear that the problems of timeliness considered in *Evans* do not apply where it is alleged that there was "a discriminatory promotional system where the discrimination continues from day to day and a specific violation occurs whenever a promotion is made." *Fowler v. Birmingham News*, 608 F.2d 1055, 1057 N.3 (5th Cir. 1979).

**7.** It is not at all clear from the record that the plaintiffs intended to make a show of broad discrimination with respect to supervisory positions. At trial, counsel stated that "if it is not already clear, we have no specific individual claim other than that of Frank Williams." Tr. 1782. Counsel further stated that "if there is a case of with respect to professional personnel, we would hope that it would be not adjudicated since it is not presented here. . . ." Tr. 1782–83.

plete absence of qualified black engineers and the general necessity for experience in lower jobs before more demanding functions could be adequately performed. FF 73, CL 24, 25, 26. These findings establish directly that about half the supervisory positions involve highly technical skills for which *no* blacks could be found. Thus, staffing of these jobs could not possibly be found to have involved any "pattern or practice" of discrimination. Similarly, the evidence clearly established that there were few blacks in jobs outside the wood yard and labor pool at any time before trial. To be sure, this situation can be readily attributed to prior discriminatory practices. But, nonetheless, it effectively eliminated any requirement for post-Act discrimination in supervisory staffing. No "pattern or practice" was even necessary because, substantially as was true with engineers, few, if any, blacks had yet reached positions from which they might have been promoted to supervisory roles.[8]

Apparently, Judge Lawrence discounted these circumstances largely because of his mistaken interpretation of Plaintiff's Exhibit 11. *See* FF 73. In fact, it does not appear that Continental appointed supervisors directly from lower jobs in the various LOPs, and certainly not directly from the labor pool where most blacks worked in the pretrial period. FF 61. Defendant's Exhibit 25. Nor does it seem possible to fault such a policy. If business necessity generally supported experience requirements for performing the more advance jobs in the various LOPs, as Judge Lawrence concluded, it would surely support the same considerations in selection of supervisors to oversee them.

Furthermore, it does not appear that the number of vacancies which occurred in supervisory jobs in the post-Act period is suf-

ficiently large to permit an effective statistical comparison, even had one been attempted. *Teamsters*, 431 U.S. at 360, 97 S.Ct. at 1867. Only about ten openings developed at the mill in the relevant supervisory positions prior to trial. See DX 25, Stipulation Exhibit Q. In the years since *Teamsters* many courts have recognized that samples in this size range or even substantially larger ones provide little support for an inference of discrimination. See, *e.g.*, *Adams v. Reed*, 567 F.2d 1283, 1287 (5th Cir. 1978); *Roman v. ESB, Inc.*, 550 F.2d 1343, 1352 (4th Cir. 1976); *Friend v. Leidinger*, 588 F.2d 61, 64 (4th Cir. 1978); *Presseisen v. Swathmore College*, 442 F.Supp. 593, 622 (E.D.Pa.1977), *aff'd* 582 F.2d 1275 (3rd Cir. 1978).

With reference to gross statistical comparisons in clerical employment, a more detailed examination of the evidence in light of *Teamsters* similarly negates any inference of discrimination. Obviously, special skills in typing, and other office operations are needed for adequate performance in these jobs. Plaintiffs neither showed nor even attempted to show that any particular black population possessed these capacities in a measure which departed from the percentage of blacks in fact employed by Continental. Furthermore, it does not appear that the number of clerical vacancies subsequent to the effective date of Title VII was large enough to permit inference of a pattern of discrimination. No suggestion has been made that the number of vacancies exceeded approximately ten during the period before entry of Judge Lawrence's Order, of which five occurred before trial. Four were filled by blacks. See Tr. 1796–1804; Stipulation Exhibit Q. Obviously, this percentage hardly suggests purposeful discrimination. By far the more likely explanation of the overall paucity of black employees is the pre-Title VII policy of the

---

**8.** For example, in February, 1972, there were only four blacks in production LOPs outside the labor pool and the wood yard. There were approximately 181 whites in these LOPs. FF 61. Thus, the absence of black supervisors could not be said to be unexpected or to provide evidence of discrimination which was not already noted in direct consideration of hourly

production jobs. In *Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374, 1387 (5th Cir. 1978), relied upon by the plaintiffs, there was a clear disparity between black hourly and black salaried employees. Here, comparisons within the various production LOPs reveal no such discrepancies.

company. Considering this argument in *Teamsters*, the Court states that it "would be a forceful one if this were an employer who, at the time of suit, had done virtually no new hiring since the effective date of Title VII." 431 U.S., at 341, 97 S.Ct., at 1857. Continental is such an employer.

In the absence of persuasive statistical evidence, it appears unlikely that the testimony of two individuals as to their personal experiences could make out a prima facie showing of discriminatory "pattern or practice." Moreover, upon close examination of this testimony, it is by no means clear that either individual was denied a position for which he was qualified. Though Mr. Webber was a skilled typist, he was not able to take dictation as one job opening required. Nor did he have the training or experience of whites who received other clerical jobs. Tr. 1797–1804. In fact, Mr. Webber made no claim that any specific job for which he was suited was denied him. Tr. 1013. Furthermore, when he was given a clerical position in January, 1969, it was by the company's special solicitation. He had never applied for such a job, and there was good reason to doubt that he would even want the position.[9]

Similarly, there is substantial basis in Mr. Williams' own testimony for doubt that any discrimination was involved in his appointment to a supervisory position. By his admission, he did not meet customary criteria for supervision of a labor gang. Tr. 994. Furthermore, it is undisputed that he qualified only after training which the company arranged specifically and specially for him. Tr. 996. There is no evidence that this training was not necessary. Thus, it would seem to significantly bolster the view that

he was initially unqualified. Moreover, the fact that the defendant arranged for it without apparent compulsion would seem to rebut inference that it had any discriminatory intent.

In sum, *Teamsters* and *Hazelwood* caution against drawing easy inferences from statistical evidence that fails to accord due weight to the qualifications of the groups being compared. When one moves beyond such gross, largely only implicit comparison, it does not appear that any inference of discrimination is possible. It does not seem that blacks were underrepresented in filling the few clerical vacancies which developed. About half of the supervisory positions at issue admittedly had no possible black occupants. The remaining ones were little if at all different when legitimate company promotional policies and the availability of experienced black workers are properly considered. At most, the plaintiffs demonstrated only isolated, temporary acts of discrimination against two employees who were in fact promoted in any case. The Court cannot conclude that this slender evidence establishes even a prima facie showing that "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Teamsters*, at 336, 97 S.Ct. at 1855.

### III. Hourly Production and Craft Employees

#### A. *Teamsters* and § 703(h)

The major holding of *Teamsters* is, of course, with respect to § 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), which provides in pertinent part as follows:

Notwithstanding any other provision of this subchapter, it shall not be an unlaw-

**9.** THE COURT: Mr. Farrington (plaintiff's counsel), do you think Mr. Webber was really qualified, or would prefer or choose a typist or stenographer? He said he could type seventy words a minute. I'm not sure, but he had no experience taking dictation.
MR. FARRINGTON: Well, that's why I'm asking about these jobs. What's required for these jobs. There were vacancies in these jobs, and Mr. Webber, I believe, Mr. Adams testified that Mr. Webber indicated that notwithstanding the lack of the ability to ad-

vance in these jobs and lower pay, he would nevertheless—he still wanted these jobs.
THE COURT: Wanted a secretary's job?
MR. FARRINGTON: A clerical job. Just because they call it a secretary, doesn't mean it has to be a woman's job.
THE COURT: Go ahead, but I just don't see Mr. Webber agreeing that he's going to take secretarial work with his experience and ability in other fields.... Tr. 1798–99. Tr. 1798.

ful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system, ... provided that such differences are not the result of an intention to discriminate because of race ... or national origin....

Prior to *Teamsters*, numerous courts, including obviously Judge Lawrence in the present case, had held that this exception for "bona fide" seniority did not protect a seniority policy which perpetuated the effects of pre-Act discrimination. 431 U.S., at 378, n.2, 97 S.Ct., at 1876, n.2 (dissenting opinion of Mr. Justice Marshall). Nonetheless, it was the view of the majority that "an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination. Congress did not intend to make it illegal for employees with vested seniority rights to continue to exercise those rights, even at the expense of pre-Act discriminatees." 431 U.S., at 353–54, 97 S.Ct., at 1863–64 (footnote omitted).

Of course, guidance in determining whether a seniority system is bona fide must come principally from *Teamsters* and the interpretative decision of the Fifth Circuit in *James v. Stockham Valves and Fittings Co.*, 559 F.2d 310 (1977). Unfortunately, however, neither of these actions presents the close, hotly disputed factual questions which might have led the courts into detailed consideration of the theoretical bases of their determinations. In *Teamsters*, it was "conceded that the seniority system did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free of any illegal purpose." 431 U.S., at 356, 97 S.Ct., at 1865. Thus, the major point for determination was not in real dispute. In *Stockham*, the Court met a fact situation at the other extreme. There seniority policies had been the subject of a lengthy strike characterized by extensive unlawful employment practices. The company had also been extraordinarily intransigent in maintaining segregated facilities at least until 1974. 559 F.2d, at 353. These and other obvious facts

provided a ready basis for analysis, especially in light of the fact that the Court was not there required to reach any final determination.

Nonetheless, these decisions provide significant guidelines for the Court's deliberations in the present case. *Teamsters* does reach a final conclusion that the seniority policies followed by the defendants was bona fide. Thus, one is given considerable insight at least into factors which are not sufficient to taint a seniority system. Most significantly, *Teamsters* involved an employer which had followed a policy of hiring blacks only into one, clearly less desirable LOP, while reserving more appealing positions for whites until about 1969. 431 U.S., at 337, 97 S.Ct., at 1855. Similarly, there existed an overt policy of refusal to promote blacks into the more desirable LOP solely because of their race. *Id.* at 338, 97 S.Ct., at 1856.

Obviously, these policies were discriminatory, but the Supreme Court found that they did not thereby impune the seniority system in which they were carried out. In this situation, there was discrimination but the explicit policies of the defendant employer were the source of the evil, not the system. Following this logic one can imagine an alternative situation which would produce different results. Consider, for example, a facility where promotion was not denied to blacks based on explicit, individual determination. Instead, the company follows an announced policy of promotion based on seniority, with perhaps some reliance on specific qualifications which senior employees would generally possess in any event. If such an employer also followed a policy of hiring blacks only for night shifts *and* if unions knowing this policy entered into collective bargaining agreements which awarded seniority based only on day work, the seniority system would, this Court concludes, not be bona fide. The employer and union, under these hypothetical facts, would have announced seniority as the basic criteria for promotion and then manipulated this factor so as to foreclose advancement by blacks. Thus, the seniority system itself

would amount to an independent instrument of discrimination not due protection under § 703(h).

Of course, the present case does not present any such clear situation. Moreover, for reasons that will be made explicit in Part III, the LOP arrangement in *Teamsters* does not resemble arrangements at Port Wentworth sufficiently to allow any direct analogy. But, the Supreme Court does offer one other useful general guide for our determination here. *Teamsters*, of course, allows the possibility of seniority as a remedy for post-Act discrimination without the necessity of attack on the system as illegal *per se*. 431 U.S., at 347, 97 S.Ct., at 1860. In discussing this use of seniority as a remedy, the Court notes that application should in all cases be fashioned in light of equitable attention to "the legitimate expectations of other employees innocent of any wrongdoing." 431 U.S., at 372, 97 S.Ct., at 1873. Of course, these legitimate expectations may have many origins, but among them must surely be advantages accrued under a "neutral, legitimate seniority system." *Id.* at 353, 97 S.Ct., at 1863.

[3] Therefore, this Court concludes, based on *Teamsters*, that a bona fide seniority system is one that has not been an independent engine of racial discrimination, and, hence, one that has created "legitimate expectations" in employees who have participated in the system without discriminatory motive. The Fifth Circuit opinion in *Stockham Valves* thus becomes the principle source of guidance in applying this "legitimate expectations" test. Four major foci of inquiry are announced in that order: (1) whether the seniority system operates to discourage all employees equally from transferring between seniority units; (2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice); (3) whether the seniority system had its genesis in racial discrimination; and (4) whether the system was negotiated and has been maintained free from any illegal purpose. 559 F.2d at 352.

## B.   Defining "the Seniority System"

Insofar as the Court is aware, *Stockham* is by far the most complete interpretation of *Teamsters* now available. But, before one can proceed to application of this decision, two additional questions must be resolved. This Court must determine first which of the various employment policies at the mill are to be considered as "seniority rule," and, second, how these rules are to be classified in defining the "seniority system" or system(s) at the plant.

The Supreme Court has only very recently spoken on the quite complex problem of what employment practices are to be considered "seniority rules" and, hence, within the possible protection of § 703(h). *California Brewers Association v. Bryant*, 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980). In that case, the court was specifically concerned with a contractual provision which allocated certain benefits on the basis of whether one had worked long enough in a given calendar year to be considered a "permanent" employee. No such policy is here called into question, but the opinion does provide a useful basis for the present case by its clearly very broad reading of the term "seniority rule" to include "ancillary rules that accomplish certain necessary functions which may not themselves be directly related to length of employment. For instance, every seniority system must include rules that delineate how and when the seniority clock begins ticking, as well as rules that specify how and when a particular person's seniority may be forfeited." Opinion of the Court, at 8 (footnotes omitted).

The Court understands defendants here as attempting to place under the rubric "seniority" and, hence, the possible protection of § 703(h) employment policies with respect to promotion within LOPs, between them, and between job categories such as the labor pool, which are not part of LOPs, and the lines to which promotion is gained from them. That much would certainly seem well within the strictures of *Bryant*, and plaintiffs do not dispute this view.

Plaintiffs would, however, add as well the designation of which jobs were to be included in which LOPs and toward which positions seniority would accrue. Thus, they would hope to establish that the entire seniority apparatus at Port Wentworth was tainted by discrimination, particularly with respect to the wood yard LOPs.[10]

Defendant UPIU has argued particularly vehemently that the LOPs "are separate and distinct from seniority systems and bias in the seniority system may not be inferred from evidence of discrimination in the arrangement and staffing of lines of progression." Memorandum In Support of Reconsideration of January 28, 1980, at 5. The LOPs are, defendant suggests, derived from the manufacturing process and the skills associated with it, not the conscious choice of any of the defendants.

Of course, the Court recognizes that the LOPs at Port Wentworth must and surely do reflect in some significant part the exigencies of the production process. The discipline of a competitive economy would presumably insure this. However, defendants would have the Court go much further. In effect, they would have the Court read "line of progression" as "line of production." This certainly moves much too far. In the first place, it would demand completely ignoring the second of the four criteria under *Stockham* which specifically directs the Court to consider the rationality of seniority unit. Similarly, defendant's argument would require the Court to ignore the considerable attention given to the structure of LOPs in *Teamsters*. 431 U.S., at 356, 97 S.Ct., at 1865. Moreover, as will be demonstrated below, there are several particular aspects of the LOPs at Port Wentworth which further vitiate any suggestions that they be excluded from consideration *a priori*.

Thus, the Court concludes that the arrangement of LOPs is a central consideration in determining whether the system at

issue is bona fide. However, it still remains to define the contours of the "seniority system" which is here at issue. *Teamsters* and *Stockham* involved only one union defendant. Thus, the problem of determining how several seniority *systems* were to be analyzed was not specifically faced. Nonetheless, in *Stockham*, the court directly considers along these lines: "[t]he facts of a particular seniority unit are critical to a determination whether a seniority system is bona fide; and a case-by-case analysis of seniority systems in light of § 703(h) is necessary." 559 F.2d, at 352. Thus, the court seems to suggest individual attention to each union's particular bargaining history and policies. In fact, the court has specifically approved attention to the individual performance of particular unions with respect to seniority policy in a paper mill structure much like Port Wentworth. *Myers v. Gilman Paper Company*, 544 F.2d 837 (1977), *remanded for reconsideration in light of Teamsters*, 556 F.2d 758 (1977).

But, even were a precedent unavailable, it seems to the Court that the purpose of this analysis demands particularized consideration of the seniority systems of the various unions. In the present case, it must already be apparent that there were very significant differences in the racial problems and resulting policies of the several unions. These differences will be considered in greater detail below, but it is obvious enough here that the nature of the actions and, hence, the "expectations" of the various unions varied significantly between the craft units which had little or no contact with blacks and the defendant UPIU which had many black members and, for a time, segregated representation. If the Court is to accord due solicitude to "legitimate expectations" under these facts while at the same time giving proper attention to possible abuses, these distinctions must be explicitly recognized.

---

**10.** This situation of plaintiff seeking a broad definition and the defendant union arguing for narrower interpretation of "seniority" was apparently not anticipated in *Bryant*. There the court expressed concern that a broad reading of § 703(h) not "swallow" the general prohibition on non-seniority factors which perpetuate discrimination. Here, of course, a narrow view might and, as will be apparent, in fact would give greater effect to § 703(h).

In sum, then, the Court will proceed to a consideration of the individual status of the various defendant (and former defendant) unions with respect to broad policies concerning promotion and transfer. This consideration will include specific reference to the structure of the various LOPs and any racial motives which may be thus reflected. In this review, the Court will be guided by the criteria announced in *Stockham Valves* toward a determination of the role of impermissible racial motivation in seniority policies such as would destroy "legitimate expectation" of benefit in offending seniority units.

### C. Application of *Teamsters* and *Stockham*

#### 1. The Craft Unions: IAM, UAJ, IBEW

■ As must already be apparent, Judge Lawrence's Order may be seen as largely dictating a finding that the particular seniority systems of the craft unions were not illegal, or at least not here subject to a declaration of illegality. Plaintiffs made no attempt at trial to demonstrate discrimination by UAJ in its seniority policies or otherwise. CL 8. Hence, there would seem no basis whatever for any finding concerning UAJ, much less against these unions now approximately seven years after conclusion of the main proceeding. Furthermore, at trial, IAM indicated that they had consented to all seniority relief sought by plaintiffs and characterized in this agreement as in the nature of a settlement. Tr. 1045. CL 6. Thus, any inquiry into whether their seniority policies were bona fide is now moot.

The IBEW Unions were, of course, granted a directed verdict at the conclusion of plaintiff's case by Judge Lawrence. CL 7. This determination was based upon the failure of plaintiffs to adduce any evidence that blacks had ever held or sought membership in these organizations in connection with the Port Wentworth mill. Obviously, a seniority system cannot impact on black employees if there are none. Seniority by definition applies only to persons who have gained admittance to a job network. By hiring only whites into the labor pool in the pre-Act period, Continental foreclosed the possibility of blacks attempting or developing any connection at all with the IBEW Unions.

Of course, the situation which existed with respect to the IBEW Unions prevailed as well in the IAM and UAJ organizations. Even were their policies now properly before the Court, it would seem impossible to find any evidence that they were not bona fide. Manipulation of seniority with the intent to discriminate demands first that some possibility of loss of benefit to blacks exists. Formation of intent requires before anything else the existence of a problem, a situation which might be met by discriminatory conduct. Hiring policies followed at the mill by the express, admitted decision of the company completely shielded these Unions from choices which might have led to illegal seniority policy. See, *e.g.*, Tr. 1468, 1473. Expectations in these unions remained legitimate if only because there was never any threat which would have occasioned development of illegitimate motives. *Harris v. Anaconda Aluminum*, 479 F.Supp. 11, 30 (1979).

Therefore, with respect to these craft unions, there seems little point in a detailed application of the criteria developed in *Stockham*. No real comparison of the impact of these unions' seniority policies on transfer between units is needed because Continental allowed no black employee in the pre-Act period to make any transfer on any conditions. Thereafter, transfer was at best only a dim possibility for any worker, black or white. There has been no suggestion that the craft unions followed seniority policies at Port Wentworth which were in any way different from their general pattern in all the contracts they entered and certainly none that these unions arbitrarily included or excluded persons in the formation of bargaining units. Finally, as has already been indicated, exclusion of blacks from the labor pool that supplied these unions made it completely unnecessary that seniority plans be created or maintained for discriminatory purposes.

### 2. Seniority Policy and the UPIU Unions

■ Continental's overt, absolute refusal to hire blacks into the labor pool effectively insulated the craft unions from any need to discriminate by means of seniority manipulation or otherwise. However, the situation was obviously much different in the wood yard where the UPIU and its predecessors represented black and white workers. To be sure, merely hiring blacks in the yard did not demand that the seniority system be used for illegitimate, discriminatory purposes. But, it did introduce a significant, indeed, classic problem: how these blacks were to be "kept in their place."

Continental might have contained blacks in the inferior station it admittedly intended by a variety of means. It might simply have declared that, just as it would not hire blacks into the labor pool at all, neither would it promote blacks above some arbitrarily set level in a wood yard. Such a practice would not then have been illegal. Continental, however, did not choose this approach. In fact, one is told, it did not really make any racially-based employment policy determination at all in the wood yard, except, of course, with respect to initial hiring. Instead, blacks were allegedly controlled by general application of a "neutral" promotional system which recognized only length of service, subject to qualification for the higher position, and preparatory experience in functionally related lower-level jobs. They reached no higher than chipper-feeder not because they were black, but because their abilities and LOP they entered prepared them for no better positions.

Obviously, the bifurcated wood yard seniority system was the device which defined the status of black employees at Port Wentworth. Equally obviously, it defined a "physically hard," "dangerous," distinctly inferior status. Tr. 1319. Thus, the Court must consider whether this clearly discriminatory consequence of the wood yard system was intended. The Court must determine whether it was a circumstance which Continental and the UPIU unions permitted, perhaps even relished, but did not specially devise, or whether it was the purposeful result of intentional discrimination. If the inferior position of blacks in the wood yard was merely the "natural" outcome of admitted hiring discrimination, this seniority system might logically remain bona fide. If, on the other hand, the relegation of blacks to a few completely separated and distinctly unequal positions was achieved by intentional, purposeful manipulation, the seniority system would necessarily be tainted. It could not be deemed "neutral" or "legitimate" and any privileges accorded white workers under it could hardly be characterized as "legitimate expectations" due the solicitude of § 703(h).

Intent in Title VII cases is rarely subject to direct discovery. Inference is almost always required and, thus, *Stockham*, of course, provides the framework for analysis of the motivation behind facially neutral seniority policies. Addressing these criteria, Continental and the UPIU Unions make much of the fact that their seniority system closely resembled others in the mill industry. This, they allege, demonstrates that the system had its genesis in industry practice, not discriminatory purpose. However, the force of this argument is much obviated by the apparent rampant discrimination in the industry.[11] Moreover, examination of data the UPIU has provided concerning recent union contracts indicates that the Port Wentworth practice of awarding seniority by LOPs within departments such as the wood yard is not nearly so typical of the national pulpwood industry as defendants would have the Court conclude. The UPIU is organized into twelve areas, eleven covering the continental United States. Affida-

11. For example, in *Rogers*, Note 2, *supra*, the defendant UPIU stipulated that it had been guilty of discriminatory conduct with respect to a paper mill having a personal policy history almost identical to the Port Wentworth plant. It is difficult to see how an assertion of neutrality is supported by reference an industry with examples such as this, and certainly *Rogers* is far from unique. *Id.*

vit of John W. Shank. These areas may be grouped roughly as follows:

| Northeast | — Area 1 (Mass., R.I., Maine, N.H., Conn., Vt., N.Y.) Area 2 (N.Y., N.J.) Area 3 (Pa., N.J., Del.) |
| South | — Area 4 (N.C., Va., W.Va., Md.) Area 5 (Ga., Fla., S.C., Ala.) Area 6 (La., Tex., Miss.) |
| Southwest | — Area 7 (Ark., Tenn., Ka., Okla., Colo.) |
| Midwest | — Area 8 (W.Va., Ohio, Ky., Ill.) Area 9 (Mich., Ill., Ind., Minn.) Area 10 (Wisc., U.P.Mich., Wisc., Iowa, N.D., S.D., Minn.) |
| Far West | — Area 11 (Alaska, Ore., Calif., Wash., Montana, Idaho, Arizona) |

UPIU Exhibit A. These areas may then be considered according to the type of seniority system utilized by plants with respect to various types of job actions, i.e., promotion, demotion, layoff, recall, transfer. Several types of seniority provisions are to be found, i.e., time on a given job, on a job within an LOP, in an LOP, a department, division, plant, or simply with the company. For present purposes, the most important consideration is obviously the allocation of promotions since it is this problem that most directly impacts on blacks and wood yard employees. A summary of UPIU contract provisions by region reveals the following:

|        | 1  | 2  | 3 | 4  | 5 | 6  | 7 | 8 | 9  |
|--------|----|----|---|----|---|----|---|---|----|
| N.E.   | 32 | 11 | 2 | 45 | 0 | 23 | 7 | 1 | 16 |
| M.W.   | 34 | 11 | 5 | 50 | 0 | 12 | 0 | 1 | 18 |
| F.W.   | 7  | 1  | 1 | 2  | 0 | 0  | 0 | 0 | 2  |
| So.W.  | 6  | 7  | 0 | 3  | 0 | 0  | 1 | 0 | 0  |
| So.    | 27 | 34 | 4 | 7  | 1 | 4  | 2 | 0 | 3  |

Key:
1. pure job seniority
2. job within LOP (the Port Wentworth method)
3. LOP
4. departmental
5. division
6. plant
7. company
8. other
9. unknown or unspecified

Source: UPIU Exhibit B (Data covers union contracts in effect generally between about 1975 and 1980. While other data relating more closely to the period during which the mill under review here was organized might have been more useful, the Court doubts that any different conclusions would obtain in view of President Glenn's indication that job-type seniority was even more common until court rulings under Title VII began mandating plant-wide seniority in areas where jobs had been segregated. Affidavit, at 23).

————

The significance of these data is more readily apparent when one considers the consequences of the various methods of allocating promotions. Assuming that blacks are employed at all in a given mill, their opportunities for advancement are obviously increased to the extent that seniority is allowed to apply to a broad range of positions and plant areas other than the one the worker actually occupies. Thus, a system of plant or company seniority would tend to enhance opportunities for promotion and dispersion of blacks throughout a mill. On the other hand, where seniority is limited to smaller units, such as LOPs or jobs, opportunity would be sharply curtailed. Glenn Affidavit, at 20. When these considerations are applied to the above data, the following results are obtained:

Seniority Summary – Promotions

|        | (1 – 3) | (4 – 7) | (8 – 9) |
|--------|---------|---------|---------|
| N.E. . | 45      | 75      | 17      |
| M.W.   | 50      | 62      | 19      |
| F.W.   | 9       | 2       | 2       |
| So.W.  | 13      | 4       | 0       |
| So.    | 65      | 14      | 3       |
|        | 182     | 157     | 41      |

From this display, it is quite obvious that papermill seniority arrangements in the South are *not* typical of those found in other areas of the country. Southern mills are far more likely to employ seniority systems which support invidious discrimination than those in the Northeast and Midwest where most other mills are located. In particular, whereas departmental or broader seniority provisions predominate in the latter two areas, in the South, they form a minority by a ratio of more than four to one (65 to 14). This finding strongly supports plaintiff's contention that the Continental Can seniority system was not developed in a neutral fashion, but, instead, as a means to provide for continuing segregation of mill employees.

This analysis of the genesis of the seniority system is further supported by other evidence supplied by the UPIU. Thus, the Court is informed that the Southern areas (IV, V, VI), where departmental or broader seniority is least popular, were precisely the areas where the UPIU maintained segregated locals. Glenn Affidavit, Exhibit C. Moreover, Mr. Glenn, who is currently President of UPIU, makes it clear in his affidavit that these policies were developed directly out of the segregated work arrangements which prevailed in the South generally and particularly the Southern paper industry. Mr. Glenn explains that, had the union insisted on integrated locals, "it would not have been successful in recruiting the support of the whites and the blacks as members." Affidavit, at p. 16. For this reason, "since such a practice was lawful at the time, conformed to the customs of the community, removed a substantial implement to organizing, and opened the way for black participation in union activities, the International Union acquiesced to . . . separate local union charters." *Id.*, at 17. See *Swint v. Pullman-Standard*, 624 F.2d 525, 533 (5th Cir. 1980). Of course, in so doing, the union also "acquiesced" to company racial job allocation policies. *Id.*, at 19, 24.

In light of all these considerations, there would seem to be little room for serious argument against the proposition that the Port Wentworth seniority system had its genesis in segregation. Such racial views were more than merely the overall social context in which the plant was organized. *Stockham*, at 352. They were the basis for a plant organization which presumed that blacks were and for the indefinite future would continue to be unsuited for any job except the most menial and the least remunerative. *See* Affidavit of Claude Adams (plant manager), at 3–4. To be sure, the UPIU predecessor unions may have deplored such attitudes, but, nonetheless, they "acquiesced" to seniority policies which not merely reflected these views, but insured that they would be unchallenged because blacks would never become eligible for promotion to more attractive positions. The arrangements which achieved this end, while by no means unknown in other geographical areas, were clearly far more common to the South and its peculiar racial problems. Certainly they were not universally or even generally employed in the industry.

With respect to whether the seniority system operates to discourage all employees equally from transferring between seniority units, it has been argued that the Port Wentworth system is not discriminatory because whites as well as blacks were foreclosed from transfer without loss of accumulated seniority. This observation is, of course, technically correct, but it fails to consider the practical reality that whites already hold the better jobs. Thus, they have substantially less incentive to transfer and enjoy substantially superior benefits without changing jobs. On the other hand, blacks have good reason to seek transfer. Yet, loss of seniority was clearly a critical consideration to black workers. Transfer would mean loss of all such status. See, e.g., Tr. 78. Moreover, the fact that seniority for blacks did not accrue toward jobs outside their woodyard LOP made eligibility for transfer a factual impossibility during the pre-Act period. Thus, it appears that the Port Wentworth system fails this criteria as well. Certainly, this conclusion is directly supported by the *Swint* holding that "by locking blacks into the least remunerative departments a greater impact was felt by blacks than by whites." 624 F.2d, at 531.

Consideration of the configuration of the wood yard seniority units lends further support to the conclusion that the system was not bona fide. In this regard, it appears that the LOP units bore no true rational, much less necessary relationship to the production process at the mill. Defendant Continental's main witness, plant manager Claude Adams, described the mill operation as a single continuing process, not the sharply divided functional system defendant would use to justify the stark color line between the wood yard LOPs. Tr. 1126. There was no clear division between function in the yard which could support the division between races. Tr. 1343, 1415. Moreover, Mr. Adams indicated also that only very limited training was needed to familiarize senior blacks with lower white jobs in the second wood yard LOP. Tr. 1175. Nonetheless, defendant's policy was to fill these jobs only from the labor pool where workers gained no necessary exposure at all to wood yard operations. The logic of the production process would award these "white" jobs to men with wood yard experience *if* production factors were allowed to function neutrally. Tr. 811, 1161–77. The fact that more attractive wood yard jobs were not staffed from within the wood yard strongly implies that the real logic of this system was not production but race.

This conclusion is much buttressed by examination of the final criterion under *Stockham*. One must consider not merely whether the seniority system was created with discriminatory purpose, but whether it was *maintained* for that end. *Harris v. Plastic Manufacturing Co.*, 617 F.2d 438 (5th Cir. 1980); *Acha v. Beame*, 570 F.2d 57 (2nd Cir. 1978). Thus, the Court may accept *arguendo* the characterization of blacks as unsuited to any tasks except manual labor in 1948. Nonetheless, it is apparent that the company did not subscribe to this view by the approximate time when Title VII became effective. Mr. Adams testified "that the chipper feeder should and could and the company would recommend that they be granted the right to go to crane service man tractor if they desired." Tr. 1763. Thus, within barely six months of the effective date of Title VII, Continental began attempting to merge seniority units in the wood yard with the precise purpose of eliminating discrimination. The Court can conceive of few clearer indications that production did not dictate a divided wood yard and racial considerations did.

However, several additional facts are important. In the first place, when the merger did take place, as was indicated above, blacks were able to master jobs that had been deemed beyond their skills with only a minimum of training. Moreover, the company did not find any black workers who could not perform these duties after appropriate instruction. Tr. 1176. And, in fact, the company indicates that at present *all* pre-1965 black employees still at Continental are in formerly all white positions.

Stipulations 10, 11, Exhibits M, N–1 through N–45. There has been no suggestion that these employees are not satisfactorily performing their duties. Thus, it seems apparent that race, not experience or ability, prevented their promotion.

This conclusion is made even more certain by the reaction of the UPIU to Continental's merger proposals, i.e., the delay of approximately two years in a vain attempt to protect white privilege. In *Stockham* the Court found evidence of company resistance to union efforts for change in seniority policy highly probative of the discriminatory character of the system. *Stockham*, at 352–53. In the present case, company efforts met union resistance, but, obviously, the import of the conflict is identical. Even if no discriminatory motive had inspired the initial wood yard organization, it is apparent that for some time before 1965, this bifurcated system had been preeminently a racial system, maintained for purposes of racial discrimination just as surely as it was modified—under pressure of law—to obviate this discrimination.

Thus, the Court concludes, based on the nature of the seniority structure itself and the overt conduct of defendants UPIU and Continental with respect to it in almost the precise period here at issue, that the system was not bona fide. It was maintained to discriminate against blacks, and, in fact, it obviously did so. With this purpose and effect, there can be no doubt that it gave rise to no "legitimate expectation" of continued benefit in white UPIU members. Unlike the craft unionists, these employees did face a serious, immediate racial challenge. The response from union and company was discrimination carried out by manipulation of the seniority structure at Port Wentworth. Such a structure enjoys no protection under § 703(h). It is, just as Judge Lawrence originally determined, illegal.

### Summary Conclusions

Analysis of employment policies at Port Wentworth suggests several broad conclusions. It is obvious that race was a primary factor in the initial staffing and organization of the mill. The production process required laborers in many areas of the mill, as well as the woodyard, of course. Whether in response to perceived public attitudes or based on its own determinations, Continental's predecessor chose to allocate these jobs on a highly invidious racial basis. One group of laborers—whites—was placed in the "bull gang" where eventually they might be promoted to other jobs or even reach a supervisory position. Blacks, on the other hand, were put in a short, dead-end LOP in the wood yard, with no possibility of promotion, beyond a very limited range.

There is absolutely no question that the intent and result of these policies was racial discrimination. Neither is there any doubt that the company purposefully maintained segregation at the mill at least until around the time Title VII appeared. The only serious issue is whether the seniority system was used as a vehicle for segregative purposes. After careful examination, the Court concludes that it was. Seniority policies were developed with a particular eye toward accommodating racial plant organization. Job seniority was used generally in the South and in particular at Port Wentworth because it minimized the possibility of blacks becoming eligible for dispersion and promotion throughout a plant. It was used to freeze blacks into the least desirable jobs, just as it continues to have this effect presently. As the Fifth Circuit has recently found in considering another company's policies, the seniority system at Port Wentworth, "tracked and reinforced the purposefully segregated job classification scheme maintained by the company and the conclusion is inescapable that the seniority system itself shared in that same unlawful purpose." *United States v. Georgia Power Company*, 634 F.2d 929, 936 (1980).

The Court thus determines that the seniority system in the production areas was not bona fide within the meaning of *Teamsters.* This conclusion is perhaps inevitable given the pervasive role race long played in employment practices at the mill and the obviously central function a seniority sys-

tem must fulfill in implementing personal policies. However, the Court's finding is a limited one. I do not find basis for liability outside the production area and the relatively small number of black employees hired before Title VII. Relief accorded this group in Judge Lawrence's Order will therefore be left undisturbed. However, the Order is hereby amended to delete class certification and relief accorded with respect to clerical and salaried positions. All other portions of the Order of August 18, 1976 inconsistent with the above findings are similarly overruled.

In light of this Order, the Court concludes that motions now pending with respect to discovery and objections to evidence are now moot. The Court will allow thirty days from entry of this Order for the parties to develop proposals for resolution of those issues which do remain before the Court.