Henry SPIGHT, et al., Plaintiffs,

v.

TIDWELL INDUSTRIES, INC., d/b/a
LaSalle Homes, Defendant.

No. WC 81–74–WK–P.

United States District Court,
N.D. Mississippi, W.D.

Nov. 23, 1982.

124

David G. Hill, Oxford, Miss., for plaintiffs.

Gary Kessler and Thomas J. Hughes, Atlanta, Ga., for defendant.

## MEMORANDUM OPINION

KEADY, District Judge.

In this Title VII class action, plaintiffs Henry Spight, Jeremiah Simmons and Ernest Rainer sue defendant Tidwell Industries, Inc., d/b/a LaSalle Homes (LaSalle), to redress alleged employment discrimination on the basis of race. LaSalle maintained a workforce of between 104 and 145 employees during 1975 through 1981 (the period relevant to this lawsuit) for the manufacture of mobile homes at its plant in Ripley, Mississippi. Plaintiffs filed charges of discrimination with EEOC during August and September of 1979 and upon receipt of their respective notices of right to sue, timely filed their complaint on June 2, 1981. That complaint contained both individual and class claims of employment discrimination by defendant.

Finding plaintiffs satisfied the requirements of Rule 23(a), F.R.Civ.P., we conditionally certified this cause as a class action and defined the class as all past, present and future black employees of the LaSalle Homes, Ripley, Mississippi facility working in production positions. Upon bifurcation of the cause as to issues of liability and relief, the court conducted a two-day evidentiary hearing. The court modified, at the outset of the hearing, the definition and scope of the claims subject to litigation in two respects. First, in view of *General Telephone Company of Southwest v. Falcon,* —— U.S. ——, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), the court ruled plaintiffs improper class representatives of class discriminatees who may have been subjected to discriminatory discipline and termination. Second, the court chronologically limited membership in the class to those who may have been subject to discrimination by defendant on or after January 31, 1979. *See Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798 (5 Cir.1982) (class membership limited to those persons who could have timely filed charges of discrimination 180 days prior to initial charge filed by named plaintiff). Following the hearing, the court reviewed the parties' memoranda and finds the case is ripe for decision. We now make specific findings of fact and conclusions of law as required by Rule 52(a).

## I. BACKGROUND

Tidwell Industries is engaged in the manufacture for sale and distribution of mobile homes at its LaSalle plant in Ripley, Missis-

sippi. Between five and seven homes are assembled each work day in a production line manner. The production area of the plant is divided into 15 departments which sequentially perform specialized functions in the manufacturing process, i.e., frames, plumbing, floors and carpets, sidewall build and set, partitions, electrical, saws, roof, metal, cabinet build, cabinet set, molding, inside paneling, final finish, front doors and yard, and quality control. The general manager is in charge of the entire manufacturing process, and has absolute authority to hire, fire and promote employees at his discretion. From January 6, 1976, to February 15, 1981, LaSalle employed D.L. "Bones" Creel as general manager. From February 15, 1981, to the date of trial, William Matthews filled the general manager's position. The supervisory personnel has consisted of between 5 and 9 foremen over the various production departments who may, at any given time, be in charge of from one to six production departments. In addition, LaSalle employs a production manager in direct charge of the production process. These supervisory personnel also play a role in LaSalle's promotional system. Although the general manager has ultimate control over promotions, he often supplements his personal observations with the opinions of the production manager and supervisors when considering an employee for a promotion. In making promotional decisions, the general manager takes into consideration the following criteria: work performance, acceptance of responsibilities, judgment, initiative, cooperation with fellow employees, job attitude, attendance, leadership and seniority. During the time relevant to this suit, all supervisory personnel at the LaSalle facility were white.

## II. INDIVIDUAL CLAIMS

### A. *Findings of Fact.*

Henry Lee Spight, a black, was hired in 1978 by LaSalle as a production employee in its partition set department. On his request, Spight was transferred after two months to the inside paneling department where he remained for six to eight months.

Spight was then transferred, again at his request, to the cabinet set department where he remained until his discharge on June 16, 1980. Spight's individual claims include two alleged instances of discrimination in promotions and an alleged retaliatory discharge.

In August 1979, Spight asked plant manager Creel about a sales position. Spight had no previous sales experience in the mobile home industry, nor had he ever been employed in any type of sales position. For that reason, Creel informed Spight he could not be considered for a sales job, and suggested he apply for the position of sales trainee. Creel told Spight that LaSalle had only one sales trainee at a time, and the position was currently held by Danny Shackleford. Creel advised Spight that upon the next opening he would be considered. In November 1979, the sales trainee position became vacant when Shackleford was promoted to salesperson. Neither Spight nor anyone else was placed in the trainee position, which remained vacant at the time of trial.

Prior to Spight's application, the sales trainee position had been a source of sales personnel for LaSalle. Spight was the first black to seek a sales position and, following his application, the sales trainee position was not filled. Creel testified that employment as a production employee did not disqualify a person for a sales promotion. Although admitting that Spight was qualified for the sales trainee position, Creel explained his failure to fill the trainee post was "[b]ecause we felt like that with the number of salespeople we had, that it was not proper at this time to have a sales trainee." Subsequent to Spight's application and prior to his discharge, however, LaSalle hired five white salespersons (including Shackleford). Since 1975, LaSalle has hired 25 salespersons, all of whom were white.

During Spight's employment, an opening occurred in the foreman's position over the paneling, saw and molding departments. As was then customary, the opening was not posted, and knowledge of the vacancy

was gained solely by word of mouth. In addition, no qualifications for the job had ever been posted or reduced to writing by LaSalle's management. Spight neither formally applied for the foreman position, nor expressed interest in becoming a foreman.

The foreman's job was filled by the promotion of Joe Cutberth, a white production employee, who told Creel he would like to be a foreman. According to Creel, Cutberth's work habits, attendance and work quality were good and he was a leader in his department. Creel believed that Cutberth was more qualified than Spight for the position. Moreover, two white employees with qualifications similar to those possessed by Spight were also passed over for the promotion.

On August 1, 1979, Spight filed his initial charge of discrimination with the Equal Employment Opportunity Commission. Almost one year later, in June 1980, Spight, upon leaving the plant, was discovered to have in his possession an unopened jar of putty. The plant guard made this discovery on the last work day prior to a temporary plant shutdown. The jar was turned over to Creel, who later summoned Spight to his office and inquired about the matter. In explaining why he had the putty on his person (as a cabinet setter Spight would have no need for putty), Spight told Creel that he had been helping Linda Williams, an employee in the final finish department, place putty on nail heads. Creel thereupon questioned Linda Williams, who denied that Spight had assisted her. At trial, however, Williams stated she had lied to Creel and that Spight had in fact helped her, but she had refused to tell Creel for fear of losing her job.

Spight was discharged on June 16, 1980, for theft of company property, largely because of Williams' failure to support his story. As Creel testified, LaSalle's policy was to immediately discharge an employee for theft of company property. Although the value of the 3.68 ounce jar of putty was not disclosed, and likely was only nominal, Creel testified that the value of stolen property was irrelevant to the defendant's discharge policy. On another occasion, Creel had fired a white employee for stealing approximately thirty-five cents worth of nails.

Ernest Rainer, a black employee in LaSalle's molding department, has been employed since May 1971. In 1975 and 1976 he held the position of leadman in the molding department. Rainer's individual claims include four alleged instances of discrimination in promotion to foreman of the molding department.

During the relevant period (1975 to the time of trial), four different foremen were either transferred or promoted to the foreman position in the molding department. Creel was general manager at the time of each employment action. The openings were not posted, and Rainer did not make it known to Creel that he desired to be promoted to foreman.

In 1976, Stanley Young, a white, who was already a foreman in the metal, roof and electrical departments, was assigned the additional responsibility of the molding department. When Young left his position in 1977, Neal Heavener, a white production worker, was promoted to a foreman position that included the molding and final finish departments. The following year, 1978, another change took place. Heavener's responsibilities were changed from molding and final finish to the metal department. According to defendant's interrogatory answers, Young resumed the molding foreman position for a brief period in 1978. The next employment action in the molding department took place when Cutberth was promoted to a foreman position over molding and inside paneling. The final change in molding department supervisory personnel took place in 1979 when Cutberth left and Neil Yancy, white, was made foreman over molding and cabinet build and set, a position that he has continued to fill ever since.

At the time he assumed the additional authority over molding, Young had been a foreman for approximately five years, with responsibilities in the roof, metal and electrical departments. Each of the three other

promotees, though without previous supervisory experience, had requested promotion and possessed other work qualities which weighed heavily in Creel's decisions.

Creel testified that Heavener's work was of high quality and that he had taken the initiative to do weekend service with dealers and customers. This service enabled Heavener to become familiar with the finished trailer and the customers' demands for product quality.

Creel also testified in more general terms that Cutberth and Yancy had exhibited excellent work habits, initiative and leadership qualities. Both maintained good attendance and had records for good overall work quality.

Although Rainer once left the job without permission, Creel admitted Rainer possessed the technical ability to do his job in the molding department. In fact, Rainer had been a leadman in his department in 1975 and 1976 until the leadman program was abolished. Rainer refused to accept, even on a trial basis, the front door and yard foreman's position in March 1980, stating he preferred to remain in the molding department. When management reinstated the leadman program in 1981, Rainer rejected an opportunity extended to him to participate and thereby become eligible for higher supervisory positions.

Jeremiah Simmons, a black, was employed in 1975 and has since worked continuously in the metal department. Simmons' individual claims include four alleged instances of discrimination in promotions.

Between 1976 and 1980, with Creel as general manager, the metal department was under the authority of four different foremen. Notices of vacancies and of qualifications were never posted prior to these employment actions. Simmons never asked to be considered for a foreman's job; he has indicated no interest in becoming a foreman. Simmons has a record of absenteeism.

In 1976, Dave Bonee, white, was promoted to a foreman's position over the inside paneling department; in 1977 the plumbing and metal departments were added to his responsibilities. In 1978, supervision of the metal department was shifted from Bonee to Heavener, who was already the foreman over final finish and molding. One year later, in 1979, the metal department was again shifted. The metal department was then transferred to Young, already foreman over the roof and electric departments. In 1979, supervision of the metal department was transferred to C.M. Elder who was made acting foreman after relinquishing his supervisory position over waste control.

B. *Conclusions of Law.*

In order for the named plaintiffs to prevail on their individual claims, they must first meet the familiar four-part test of establishing a prima facie case under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824.

Although Spight and other individual plaintiffs are members of a racial minority, defendant asserts Spight failed to show he was qualified for the job of sales trainee or salesperson. We disagree in part with this contention. As previously found, Creel conceded that Spight, though not qualified for a sales position, was nevertheless qualified for the job of sales trainee. We do agree, however, that Spight failed to present evidence that he was qualified to be a salesperson without first progressing through the trainee position. We therefore conclude Spight met the second element of his prima facie case as to the trainee vacancy but not for a salesperson's job.

It is indisputable Spight was rejected, or ignored, for the position of sales trainee. The only serious issue is whether

Spight met the fourth element of his prima facie case, i.e., that defendant continued to seek applicants of equal qualifications. Defendant argues Spight failed in this regard since there is no evidence that showed defendant continued to seek applicants from persons of Spight's qualifications, i.e., production employees. We find this argument unavailing. It is now abundantly clear from case law that *McDonnell Douglas* four-part test is not to be mechanically applied to the facts in all Title VII cases. *Hedrick v. Hercules,* 658 F.2d 1088, 1093 (5 Cir.1981). It is enough that a plaintiff prove by a preponderance of the evidence that he was denied promotion for which he was qualified "under circumstances which give rise to an inference of unlawful discrimination." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See also Jones v. Western Geophysical Co. of America,* 669 F.2d 280, 284 (5 Cir.1982) (burden of establishing mere prima facie case not onerous and not subject to exclusive application of *McDonnell Douglas* elements). The fourth element of *McDonnell Douglas* has, as its precise purpose, a basis for establishing an unlawful inference of discrimination. *Id.* at 284.

■ As in *Jones, supra,* we have no difficulty finding Spight presented sufficient evidence to create an inference of discrimination. While no direct evidence was presented that defendant continued to seek applicants for the sales trainee position from the production workers, it is uncontrovertible that defendant had promised Spight would be considered for the trainee position as soon as there was a vacancy. Yet this was not done. Because of Creel's admission and promise to Spight, defendant's failure to fill the vacancy becomes highly suspect. When this behavior is coupled with other factors, i.e., that Spight was the first black to apply for a sales position,

and that all salespersons before and since that application have been white, we conclude Spight has raised an inference of unlawful discrimination. Thus, Spight has made out his prima facie case with regard to the sales trainee position.[1]

In order to overcome this inference, defendant must articulate legitimate, nondiscriminatory reasons for the adverse employment action. The sole reason offered by LaSalle for not placing Spight in the trainee position was that it needed no more salespersons. Taken as true, this reason would be sufficient justification to meet defendant's burden of production. However, as required by *Burdine,* plaintiff Spight has submitted evidence to show that the offered justification is pretextual, since four white salespersons, excluding Shackelford, were hired after Spight applied and prior to his discharge. Had defendant not needed more salespersons, it most certainly would not have made four additions to the sales staff. Since the additions were made, the justification proffered by the employer must be deemed a pretext to cloak the actual motive for not promoting Spight to the position of sales trainee.

From the totality of the credible evidence, we conclude Spight has met his ultimate burden of proof, and are persuaded that LaSalle denied Spight the position of sales trainee on the basis of race in violation of Title VII.

■ The court next concludes that Spight's showing with regard to his foreman promotion claim was insufficient to state a prima facie case. Spight completely failed to present evidence that he was qualified for the position of foreman over the paneling, saw and molding departments.[2] Because of this lack of proof, Spight could not meet the second criteria of a prima facie case of disparate treatment; i.e., that

---

1. As pointed out earlier, however, Spight's claim as to the sales position fails for want of a showing he was qualified to assume the duties of the job without first working in the position of sales trainee.

2. Spight's only evidence was that he had worked at LaSalle from 1978 until his discharge on June 16, 1980. Yet Spight worked in the paneling department only for six to eight months and never worked in the saw or molding departments.

he was qualified for the job. Furthermore, it is clear that two white production employees with qualifications equal to those of Spight were passed over. Therefore, we hold that the promotion of Cutberth rather than Spight to foreman over the paneling, saw and molding departments was not racially motivated, but was for nondiscriminatory reasons.

■ We next consider Spight's claim of retaliatory discharge. To make out a prima facie case on such a claim, a plaintiff must show he was engaged in a statutorily protected activity, that an adverse employment action occurred, and that there was a causal connection between participation in the protected activity and the adverse employment action. *De Anda v. St. Joseph Hospital,* 671 F.2d 850, 856 (5 Cir.1982). Although Spight met his burden on the first two elements, we find no causal connection existing between his filing of the EEOC charge and the dismissal. Other than the mere fact that his dismissal was subsequent to the filing of the charge, Spight produced no evidence that there was a causal link or connection between the two events. On the contrary, the evidence presented proved to our satisfaction that the discharge was conducted pursuant to written company rules and was independent of Spight's actions before the EEOC. That a similar action had been taken against a white employee adds weight to that determination. Therefore, the court concludes Spight's discharge was not in retaliation to Spight's charge filed ten months earlier with EEOC. *See Harris v. Plastics Mfg. Co.,* 617 F.2d 438, 440 (5 Cir.1980) (per curiam) (similar penalties imposed on blacks and whites for violation of similar rules nondiscriminatory).

■ Under the *McDonnell Douglas* rationale for a prima facie case, Rainer encounters difficulty with the second element—that he applied for and was qualified for a job for which the employer was seeking applicants. Though Rainer was qualified for the job, it is indisputable that he never disclosed to defendant a desire for promotion to foreman.

While a nonapplicant may be "as much a victim of discrimination as is he who goes through the motions of submitting an application," *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 366, 97 S.Ct. 1843, 1870, 52 L.Ed.2d 396, 434 (1977), the nonapplicant bears the burden of proving he should be treated as an applicant. *Id.* 431 U.S. at 364, 97 S.Ct. at 1869, 52 L.Ed.2d at 433. To meet this burden, the nonapplicant must show an application would have been a "futile gesture." *Id.* 431 U.S. at 365, 97 S.Ct. at 1870, 52 L.Ed.2d at 434. The Court in *Teamsters* enumerated possible ways in which an employer might subtly convey the message of futility to its employees,[3] and of these LaSalle is guilty of at least one—the failure of LaSalle's management to post vacancies. However, the evidence also shows that in 1973 there had been a black foreman[4] and Rainer himself had been a leadman in 1975 and 1976. We conclude from these facts that Rainer failed to meet his "difficult task" of proving his application would have been futile. *Id.* 431 U.S. at 364, 97 S.Ct. at 1869, 52 L.Ed.2d at 433.

Even if Rainer had carried his burden, however, LaSalle articulated legitimate, nondiscriminatory reasons for not promoting him. LaSalle brought forth specific evidence that the promotees were more qualified to fill the position of foreman than Rainer. The transfers of additional

---

**3.** The Court noted that the message might be communicated by the employer's "consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his workforce from which he has discriminatorily excluded members of minority groups." 431 U.S. at 365, 97 S.Ct. at 1869, 52 L.Ed.2d at 434.

**4.** Although we do not consider this foreman position for purposes of determining discriminatory practices at LaSalle because it occurred prior to the relevant period to this suit, it is mentioned here merely to show Rainer's awareness of the possibility of blacks filling supervisory positions at LaSalle.

foreman responsibilities to existing foremen were brought about by economic considerations because of business slump; the selection of other promotees was generally ascribed to their affirmative attitudes and interests as well as superior work and attendance records. With this substantial evidence before the court, Rainer was unable to prove by a preponderance of the evidence that the business reasons advanced by the employer were not real or genuine.

We also conclude Simmons failed to make out his prima facie case. Simmons was unable to show either he applied for the position of foreman or that to have done so would have been futile. In addition, the court concludes from the facts of the case that there was no actual opening in the supervisory force over the metal department, but rather, LaSalle merely transferred departmental responsibilities among different existing foremen. We cannot ascribe this business decision to racial motivation in any degree. Only the 1980 foreman opening constituted a real vacancy since waste control from which Elder was transferred was not a production department and since Elder's transfer was to a different position, not a mere addition to his duties. Assuming, arguendo, Simmons made a prima facie case under *McDonnell Douglas,* we determine that LaSalle was able to rebut an inference of unlawful discrimination by presenting specific evidence that every promotee or transferee to foreman had previous experience and responsibility as a member of the supervisory force. It is clear from this evidence that the transferees were more qualified than Simmons for the position of foreman over the metal department, and the reasons assigned by the employer have not been shown to be pretextual. We conclude, therefore, that Simmons' failure to be promoted to foreman over the metal department was not the result of racial discrimination.

## III. CLASS CLAIMS

The individual plaintiffs originally brought suit on behalf of a plaintiff class claiming discrimination in promotions, job assignments, job classifications, compensation, termination, retaliation, unfair training and unfair discipline of black production workers at the Ripley plant. At the conclusion of plaintiffs' case, we granted in part defendant's motion to exclude evidence and for directed verdict on plaintiffs' class claims for failure of proof and not meeting their burden of establishing a prima facie case in all but one area. The single remaining class claim relates to alleged discriminatory promotion policies.

### A. *Findings of Fact.*

During the relevant time period, LaSalle's history of promoting blacks to advanced positions has been almost nonexistent. Since 1975, LaSalle has employed 18 white persons as department foremen. Only two of the 11 leadmen employed during the same period have been black. LaSalle during a portion of the time did not utilize the leadman position in its organization. As stated, LaSalle hired 21 whites as sales persons. A black has never been employed in a sales or sales trainee position. Of the eight inspectors employed since 1975, all have been white. Blacks have composed an average of 14.2% of the production department workforce.

According to Creel, the primary method used to notify employees of vacancies in foreman, inspection and leadman positions, prior to the 1980 EEOC investigation, was by word of mouth. No job vacancies or job qualifications were posted prior to 1980, and only at irregular occasions since. Promotee selection criteria were admittedly not reduced to writing and, in many respects, were subjective. Selection criteria included consideration of such factors as the prospective promotee's acceptance of responsibilities, judgment, initiative, cooperation with fellow employees, job attitude, attendance, leadership, as well as work performance and seniority. It must be noted, however, that LaSalle maintains only records of attendance and work quality.

In evaluating potential promotees, Creel relied upon his own observations supplemented by the opinions of the production

manager and foremen, all of whom were white during the years in issue. It does not appear that the production manager and foremen were given guidelines upon which to base their evaluations, nor do they provide the general manager written reports on their recommendations for promotions.

The net result of these promotional policies and practices in the production workforce and sales has been the selection of only two blacks as leadmen from 58 hirings or promotions to the positions of foremen, salesperson, leadman and inspector.[5]

In addition to statistical evidence, the plaintiffs offered the testimony of seven class witnesses, including Henry Spight, Ernest Rainer and Jeremiah Simmons, whose testimony has been heretofore discussed. We briefly review the testimony of four other plaintiff class members.

Willie Johnson, employed in the plumbing department, stated that the plumbing department had three different white foremen during the past 10 years. Because none had previous experience in plumbing, Johnson and other department employees were required to train them. Johnson was unaware of the procedures by which to apply for a foreman position and was not advised as to requisite qualifications. One month before trial, in June 1982, Johnson was offered the foreman position over the electrical, metal and roofing departments. Johnson refused the offer because he did not think the increase in pay as foreman would compensate for the additional hours required for the job. Johnson also expressed reluctance to work additional hours at the expense of hunting and fishing pleasures.

Lawrence Spight, Henry Spight's father, worked in the metal department for over six years prior to his retirement. Spight stated that the white foreman over that department had less experience in the department than he, and as a consequence, he had to train them. Spight was of the opinion that plaintiff Simmons also had more experience than some of the foremen in the metal department. Henry Spight said that he did not apply for foreman because all the foremen were white and he did not think it would do any good to apply.

Marvin Prather, a black electric department employee, had an electrical degree from Northeast Mississippi Junior College. He passed the examination to become a licensed electrician but did not pay a license fee. Prather was given a larger workload than other electrical department workers. He claims that is due to the fact he is the only black in the department. His workload was ordered by Joe Crawford, production manager. Prather applied for a promotion to a position in quality control (inspector) several months before trial. This vacancy was posted, but no qualifications were listed. So far as Prather knows, defendant has not yet filled the vacancy. An earlier vacancy occurring in the inspector position, which was not posted, was filled by a white electrician, Jim Ormand. Ormand, though licensed as an electrician, had less seniority at LaSalle than Prather.

## B. *Conclusions of Law.*

■ When plaintiffs' claims allege discrimination on account of the employer's subjective promotional system, the proper standard under which the claims must be evaluated is disparate treatment. *Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798, 817 (5 Cir.1982). "Hiring processes that rely heavily on subjective interviewing provide an opportunity for the intentional discrimination that lies at the heart of a disparate treatment case." *Id.* Here, plaintiffs contend their class has been illegally discriminated against in promotions because of subjective and unwritten promotional policies and practices. Thus, in order to prevail, plaintiffs must prove intentional discrimination. This is not a disparate impact case.

---

**5.** The foregoing is demonstrated by employment data for the relevant years set forth in LaSalle's supplemental responses to plaintiffs' second set of interrogatories, disclosing categories of promotions as follows: 18 foremen, 21 salespersons, 11 leadmen and 8 inspectors. We reject defendant's argument that only 10 promotions occurred.

■ A prima facie case of class-wide discrimination in disparate treatment cases is typically proved through the production of relevant statistics which demonstrate that "racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1854, 52 L.Ed.2d at 416. "[W]here gross statistical disparaties can be shown, they alone may in a proper case constitute prima facie proof" of employment discrimination. *Williams v. New Orleans Steamship Ass'n.,* 673 F.2d 742, 749 (5 Cir.1982). Should statistical proof alone be insufficient to establish a prima facie case, it may be supplemented with evidence of individual instances of discrimination and opportunities to discriminate that exist in defendant's decision-making process. *Payne,* 673 F.2d at 817.

■ Where the plaintiff class satisfies prima facie case requirements, the burden of production shifts to the employer to show either that plaintiffs' statistics are inaccurate, insignificant, or that there is a nondiscriminatory explanation for the apparently discriminatory result. *Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867, 52 L.Ed.2d at 431, n. 46. General claims of good faith or of hiring only the most qualified applicants, however, are insufficient to rebut a prima facie case. *Payne,* 673 F.2d at 817. The court may conclude that Title VII has been violated from an unrebutted prima facie case, *id.,* or it may find from the whole evidence that defendant has been guilty of racial discrimination in employment decisions.

■ We conclude from the facts disclosed by evidence that the plaintiff class has shown a basis for inferring racial discrimination in promotion practices. Only two blacks (3.45%) were promoted out of the blacks in the workforce (14.2%) in the 58 employment decisions under critical review. This disparity, though of raw numbers, does not stand alone. Plaintiffs presented credible and specific instances of discrimination, such as the denial of promotion to Henry Spight and Marvin Prather to the sales trainee and inspector positions. Further-

more, LaSalle's promotion policy was based upon predominantly subjective criteria applied by an all-white supervisory staff without written guidelines. This procedure offered an opportunity to discriminate because of race that renders the decision-making process suspect as a ready mechanism for discrimination. *Payne, supra,* at 827; *Fisher v. Proctor & Gamble,* 613 F.2d 527, 543–46 (5 Cir.1980).

Defendant contends that plaintiffs' statistics are meaningless on the claim that racial discrimination cannot be inferred from such a small sample, citing, inter alia, *Teamsters,* 431 U.S. at 339, 97 S.Ct. at 1856, 52 L.Ed.2d at 418, n. 20. Although a small sample greatly detracts from any significance to be accorded statistical evidence, we cannot agree that a total of 58 promotions is a sample so small as to lack probative force. The cases upon which defendant relies are factually distinguishable since they hold that samples numbering ten to fourteen are too small to be trustworthy. *See Mayor of City of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620–21, 94 S.Ct. 1323, 1333–1334, 39 L.Ed.2d 630, 644–45 (1974) (sample of 13); *Harris v. Group Health Ass'n., Inc.,* 662 F.2d 869, 872, n. 8 (D.C.Cir.1981) (sample of 14); *Miller v. Continental Can Co.,* 544 F.Supp. 210 (D.S.Ga. 1981) (sample of 10).

Defendant also argues that by resort to standard deviation analysis, plaintiffs' statistics are insufficient. We disagree. Using standard deviation analysis, the court concludes that the small number of blacks in LaSalle's positions of salesperson, foreman, inspector and leadman as a result of 58 hiring or promotion decisions was more likely the result of racial discrimination than chance. Here, the difference between the observed and expected number of blacks in salesperson, foreman, inspector and leadman positions is 2.29. A deviation of this magnitude closely approaches significant statistical disparity. *See Harrell v. Northern Electric Co.,* 672 F.2d 444, 446–47, n. 4 (5 Cir.1982) (2.33 standard deviations highly statistically significant disparity).

Finally, defendant claims generally that in applying promotional policies, defendant sought only to employ the more qualified applicants. The courts have not held this argument persuasive in other cases, *Payne,* 673 F.2d at 817. Nor do we find it to be here. We therefore conclude that plaintiffs' evidence of disparate treatment of the plaintiff class preponderates in support of their claims of racial discrimination in disparate promotional policies and practices. *Id.* at 818. *Little v. Master-Bilt Products,* 513 F.Supp. 901 (N.D.Miss.1981); *Vuyanich v. Republic National Bank,* 521 F.Supp. 656 (N.D.Tex.1981).

Let an order be issued in accordance herewith.